Stuart R. **MEYERS**, Plaintiff,

v.

**ASICS CORPORATION**, Defendant.

**MDL 777 (RO).**

United States District Court,
S.D. New York.

Oct. 14, 1994.

Ostrolenk, Faber, Gern & Soffen (Robert C. Faber, Charles P. Lapolla, William O. Gray, III, of counsel), New York City, for plaintiffs.

Dike, Bronstein, Roberts & Cushman (David G. Conlin, Gregory D. Williams, of counsel), Boston, MA, and Kramer, Levin, Naftalis, Nessen, Kamin & Frankel (Arthur H. Aufses, III, of counsel), New York City, for defendant Asics Corp.

Weingram & Zall (Michael E. Zall, of counsel), Maywood, NJ, for Asics Tiger Group.

Wolf, Greenfield & Sacks, P.C. (David Wolf, of counsel), Boston, MA, for Hyde Athletic Industries.

Dennis E. Sheehan, Associate Gen. Counsel, Woolworth Corp., New York City, for Kinney.

Price, Heneveld, Cooper, Dewitt & Litton (Terence J. Linn, of counsel), Grand Rapids, MI, for Wolverine World Wide and Brooks Shoe Co., Inc.

### OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

OWEN, District Judge.

The plaintiff in this case is Stuart R. Meyers, a podiatrist and the inventor of record of the three patents at issue. The patents relate to different aspects of a shoe sole with a compressibility differential. Meyers asserts that his patents were violated by running shoes manufactured by defendant Asics corporation. Asics moves for summary judgment under 35 U.S.C. § 102, on the ground that the inventions claimed by Meyers in the three patents lack novelty and should never have been granted to Meyers in the first place. After careful review of the patents at issue against the prior art, Asics' motion for summary judgment is granted.

The three patents before me are United States Patent No. 4,297,797 ('797), United States Patent No. 4,445,283 ('283), and United States Patent No. 4,627,177 ('177). The inventions relate to insoles for use in shoes, including jogging shoes. The insole is the relatively thin portion of the shoe that creates the footbed and is in contact with the foot. The midsole is the layer between the outersole, which makes contact with the ground, and the insole.

The '797 and '283 patents are similar; both concern an insole with a certain construction. Patent '797, issued in 1981, is for use in a therapeutic shoe, while '283, granted in 1984, concerns any footwear sole. The insole in both patents is to be constructed of a compressible material such as air, sand, gas, or liquid, that is less compressible on the medial (inner side, or the side of the arch) than it is on the lateral (outer) side. The entire forefoot area is also constructed of the more compressible material. Thus, as a person's weight bears down, the more compressible portions become lower than the less compressible medial portion, and the weight of the foot undergoing compression forms a medial arch.

The '177 patent was granted in 1986 and is intended to be an improvement on the insole member described in the '797 patent. In the '177 patent, the less compressible structure on the medial side of the shoe undercuts the more compressible areas, with the undercutting at the heel end at an angle of up to 85 degrees.

Each of Meyers' patents contains between six and eight claims, but the Asics shoes are alleged to infringe on only some of these claims.

Summary judgment is appropriate when there is no genuine issue of material fact, and thus the moving party demonstrates that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment procedure is designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,*

477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). It enables a court to "streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). A motion for summary judgment must be considered with due regard for the right of parties asserting adequately supported claims and defenses to have those claims and defenses tried to the jury. However, the right to a swift and inexpensive conclusion to claims and defenses lacking a factual basis cannot be ignored. *See, e.g., Celotex*, supra, 477 U.S. at 327, 106 S.Ct. at 2554.

■ Summary judgment is as appropriate in patent cases as in other cases when the requirements of Rule 56 of the Federal Rules of Civil Procedure have been met. *Howes v. Medical Components, Inc.*, 814 F.2d 638, 643 (Fed.Cir.1987). In this case, after examining the teachings of Meyers' patents, I find that the shoe insoles allegedly invented by Meyers had in fact been described in several prior art references. These prior art references demonstrate that Meyers' patents lack novelty, which is the fundamental prerequisite for a valid patent under 35 U.S.C. § 102.

Section 102 provides that a person may not obtain a patent if:

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent ..." or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States ..., or ...

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for the patent ..."

According to the terms of this statute, Meyers' three patents should never have issued. As to the '797 and '283 patents, 102(a) and (b) apply because Meyers' claimed invention was already patented in the United States more than one year prior to the filing dates of the applications which led to the issuance of these patents to Meyers. As to the '177 patent, 102(a) and (e) apply because Meyers' claimed invention was known or used by others in the United States before Meyers' invention, and was described in patents granted on applications filed before any invention by Meyers. There is no genuine issue of material fact that each element of Meyers' claims is found in a single prior art reference.

### The '797 Patent

■ It has been clearly demonstrated that the claims of the '797 patent were anticipated by prior art. The Reed patent, United States Patent No. 2,677,906 ('906), issued May 11, 1954, several decades before Meyers' '797 patent, disclosed each and every element of Meyers' claimed invention, even though the Reed patent was inexplicably not cited or considered by the United States Patent and Trademark Office in its examination of Meyers' application for the '797 patent. For instance, the Reed patent stated that "it is an object of the present invention to provide a cushioned inner sole ...," Reed, Column 1, lines 3–4, just as the "principal object" of Meyers' patent was to provide "dynamic support and cushioning to the foot." Meyers '797, Column 1, lines 63–5. Reed and Meyers' '797 also echo each other in their notions of compressibility differentials. Reed contemplated a shoe with "pockets containing air or gas either of the same or different pressures such that the support of the arch and heel may be had from pockets filled with higher pressure than the pockets that support the remainder of the foot." Reed, Column 1, lines 3–10. Reed's disclosure is strikingly similar to Meyers' description, which instructs that "the chambers may be of any size or shape as long as the lateral aspect of the shoe is more compressible than the medial [the side of the arch] aspect. Therefore, chambers located laterally may contain more compressible contents or be smaller than chambers located medially." Column 5, lines 2–6.

Setting aside these general similarities between the two patents, the most effective way to demonstrate the anticipation by Reed of each of the claims in issue is to examine each of Meyers' claims and to compare these to the Reed patent.

1. Claim 1 of Meyers '797 contemplates a "therapeutic shoe comprising an insole member." Meyers, Column 6, line 14. Reed also discloses a shoe with an "insole," a "cushioned inner sole," and with higher pressure in the arch area to support the arch. Reed, Column 1, lines 3–10. This effectively describes a therapeutic shoe with an insole member.

a) Claim 1 divides the shoe into three portions. The first portion comprises "a fluid tight chamber at the medial portion to exert pressure on the medial portion of the foot ..." The Reed patent anticipates this first portion by disclosing "fluid tight" air or gas chambers that are individually sealed with air, and higher pressure levels at key (medial) areas of the foot: "in the areas of the inner sole under the arch and heel a higher pressure is desirable and accordingly the air pockets at this location of the inner sole will be inflated to a greater extent than the pockets at other locations of the sole." Reed, Column 3, lines 8–13.

b) The second portion of Claim 1 comprises "a plurality of fluid tight chambers being compressible at the lateral portion of the foot." In Figure 7 of the Reed patent, Reed also discloses a plurality of fluid-tight, highly compressible chambers at the lateral portion of the foot.

c) The third portion of Claim 1 comprises "a compressible metatarsal portion, wherein the lateral and metatarsal portions are more compressible than the medial portion, whereby the weight of the foot undergoing compression in the lateral and metatarsal portion forms a medial arch." Reed discloses a similar portion in Figure 2 of his patent, which shows a cross section of the foot focusing on the metatarsal area. This same area of the foot is shown in Figure 5 as compressed under the weight of a foot. Reed's medial arch portion has air under a higher pressure than the remainder of the insole, and his metatarsal portion is inherently more compressible than his medial arch portion.

2. Claims 2 and 4 are not at issue.

3. Claim 3 describes the same therapeutic shoe of Claim 1, with "said insole member further comprising substantially wedge shaped internal configuration such that the heel position is higher than the toe portion." According to Meyers' deposition testimony, a wedge is an elevation where the heel is higher than the front of the foot, *see* Deposition of Stuart R. Meyers at 938, June 26, 1989, Meyers v. Asics (MDL 777). Reed contemplates a similar structure. Figure 5 of Reed shows a foot where the heel portion is higher than the toe portion. Moreover, Reed disclosed inflating the heel and arch to a greater extent than other portions of the sole, thereby creating a wedge shape. Reed, Column 3, lines 8–13.

4. Claim 5 describes the same therapeutic shoe of Claim 1, with "said member comprising a raised heel portion." As stated *supra,* this feature can also be found in Figure 5 of the Reed patent.

5. Claim 6 describes the same therapeutic shoe of claim 5, with "said raised heel portion comprising an air-tight chamber." Reed, too, discloses air chambers in the heel region, *see* Reed, Column 3, lines 8–13. Moreover, all of Reed's chambers are "air-tight": the language of Reed's patent emphasizes that "all of the pockets are individually sealed with air retained under compression therein." Reed, Column 2, lines 57–9.

Meyers contends that, unlike the Meyers '797 patent, neither Reed nor any other prior art reference has a differential compressibility in the heel and arch. According to Meyers, "the lateral portions of Reed are not more compressible than the medial portion," *see* Transcript of Oral Argument at 43, October 1, 1993, Meyers v. Asics (MDL 777). In essence, Meyers asserts that Reed failed to distinguish between the lateral and medial portions of the foot, and that when Reed contemplated higher pressure beneath the arch and heel, he intended this high pressure to extend across the entire width of the foot, rather than being confined to the medial portion of the foot. *See, e.g.,* Transcript of Oral Argument at 52, Meyers v. Asics (MDL

777). However, this interpretation is belied by the specifications of the Reed patent. Reed clearly contemplated a compressibility differential in the heel and arch, and accordingly taught that "in the areas of the inner sole under the arch and heel a higher pressure is desirable ..." Reed, Column 3, lines 8–10. As Meyers admitted, the arch, generally speaking, does not extend across the entire width of the foot. Thus, when Reed disclosed applying higher pressure beneath the arch, this necessarily referred only to the medial portion of the foot. Reed did not need to employ the terms "medial" and "lateral" in order to anticipate Meyers' patent.

Moreover, the Reed insole has at least one high pressure chamber on the medial side and a plurality of low pressure chambers on the lateral side. Under foot pressure, this forms a medial arch, which means that the average compressibility over the lateral area is greater than the average compressibility over the medial area. This average compressibility differential is precisely what Meyers' patent teaches.

Thus, each of the claims of Meyers '797 at issue in the litigation were clearly and fully anticipated by the Reed patent in 1954. Therefore, each of the claims is invalid under 35 U.S.C. § 102(a) and (b).

**The '283 Patent**

■ Meyers' '283 patent is similar to the '797 patent, except that '797 concerns an "insole member," which is inside the shoe, and '283 deals with a "sole member," which is outside the shoe. Also, '283 refers to the "remaining medial" and "remaining lateral" portions of the foot, while '797 had simply used the terms "medial" and "lateral". As explained *supra*, the term "medial" refers to the side of the foot containing the arch, and "lateral" refers to the other, non-arch, side of the foot. Meyers '283 takes the further step of referring to the toe and metatarsal sections of the foot, which include parts of both the medial and lateral portions. Therefore, the terms "remaining medial" and "remaining lateral" refer to all regions of the shoe other than the toe and metatarsal regions.

Similarly to the '797 patent, '283 proposes a compressibility differential, with the "toe, metatarsal head and remaining lateral portions being generally more compressible than said remaining medial portion." According to Meyers' own testimony, the compressibility is averaged over the entire area of each portion, so that the remaining lateral portion must be "generally more compressible" than the remaining medial portion. *See, e.g.,* Deposition of Stuart R. Meyers at 218, January 23, 1989, Meyers v. Asics (MDL 777).

By comparing the claims of Meyers' '283 patent with Reed, it becomes clear that the claims of '283 were anticipated by the prior art, and that Reed disclosed each element of Meyers' claimed invention.

1. Claim 1 of Meyers' '283 describes "a footwear sole member formed essentially of material containing a plurality of compressible fluid-filled chambers." As explained *supra*, Reed also disclosed a footwear sole member containing a plurality of compressible fluid-filled chambers, which Reed described as "pockets containing air or gas." Reed, Column 1, line 7.

a) Claim 1 continues: "and comprising toe, metatarsal head, remaining lateral and remaining medial portions ..." This description includes, obviously, the entire sole member. Reed's patent also comprises the entire foot.

b) Finally, Claim 1 provides: "said toe, metatarsal head and remaining lateral portions being generally more compressible than said remaining medial portion." Reed also disclosed that the arch portion (part of the remaining medial portion) has a higher pressure (and therefore less compressibility) than the other locations of the sole, thereby providing support to the arch. Thus, Reed disclosed toe, metatarsal head and remaining lateral portions as being generally more compressible than the remaining medial portion. By this disclosure, Reed anticipated Claim 1 of Meyers '283.

2. Claim 2 discloses "a footwear sole member according to claim 1 wherein said material is elastomeric." Reed also disclosed that his insole could be made of rubber, which is an elastomeric material. Reed, Column 3, line 31.

3. Claim 3 describes "a footwear sole member according to claim 2 having a substantially wedge shaped configuration from heel to toe, the heel portion being higher than the toe portion." Similarly, Figure 5 of the Reed patent portrays a wedge where the heel is higher and thicker than the toe portion.

4. Claims 4, 5, and 6 describe "a footwear sole member ... wherein said chambers are fluid tight." As stated *supra*, Reed discloses that his pockets are "individually sealed with air retained under compression therein;" that is, fluid-tight.

### The '177 Patent

█ The '177 patent was conceived as an improvement to the insole described in '797. Meyers '797, Column 1, lines 36–39, 45–49.-
'177 is similar to '797 in that it discloses a "footwear insole member" having two different portions in certain locations, one of the portions being less compressible than the other. However, according to '177, the less compressible portion undercuts the more compressible portions at an angle of up to 85, and the undercutting terminates in the medial area of the heel. This configuration is designed "to achieve maximum beneficial effect of the motion control technology and maximum comfort for the user." Plaintiff's Brief at 34. However, the '177 claims at issue were anticipated by the Cavanagh patent, United States Patent Number 4,506,462, which was issued on March 26, 1985.

█ Although the Cavanagh patent was issued after the original November 1, 1982 filing date of the '177 patent, Cavanagh was filed on June 11, 1982, approximately four and one-half months prior to the filing of the '177 patent application. Accordingly, under 35 U.S.C. § 102(e), Cavanagh is an effective reference as of its filing date.

Like Meyers '177, Cavanagh discloses a sole member in which the less compressible medial area undercuts the softer areas of the foot, and the undercutting takes place in the medial portion of the heel. *See* Cavanagh, Figure 3a, and Cavanagh, Column 4, lines 55–60. Meyers contends that Cavanagh does not anticipate Meyers' '177 because Cavanagh does not teach that the arch portion is less compressible than the lateral portion next to it. Cavanagh's patent stipulates that "perforations are drilled or molded into the forward portion of inner [medial] portion and arch region in order to ... increase resiliency and flexibility in the arch region to an extent *corresponding* [emphasis added] to that of outer portion." Meyers equates the word "resiliency" with that of "compressibility," and reaches the conclusion that, unlike Meyers' 177, Cavanagh contemplates a sole member with equal compressibility in the medial and lateral portions.

This interpretation is misplaced. Resilience is the "ability of a strained body ... to recover its size and form following deformation." *McGraw–Hill Dictionary of Scientific and Technical Terms,* 1604 (4th ed. 1989). Compressibility is the "property of a substance capable of being reduced in volume by application of pressure." *Id.,* at 402. The fact that two portions of a shoe are equally resilient is irrelevant to the compressibility differential between them. Cavanagh uses the term "durometer" to elucidate the difference in compressibility between the lateral and medial portion of his sole member. "Durometer" is a measure of hardness of material, and Cavanagh's medial material is "10–20 durometer greater than that of the material used for" the lateral portion. Thus, like Meyers '177, Cavanagh's medial material is significantly less compressible than the lateral material.

Accordingly, I find that Meyers '177 is not patentably novel over the disclosures of Cavanagh.

Meyers having failed on Asics' summary judgment motion to show novelty under 35 U.S.C. § 102, the motion is granted and the complaint is dismissed in its entirety.

The foregoing constitutes the Court's findings of fact and conclusions of law and is so ordered. A formal judgment is to be submitted on notice.