ACRISON, INC., Plaintiff,

v.

SCHENCK CORPORATION, Defendant.

No. 94 CV 3505(NG).

United States District Court,
E.D. New York.

July 24, 1997.

Charles W. Bradley, Bradford S. Breen, Tzvi Hirshaut, Orrick, Herrington & Sutcliffe LLP, New York City, James D. Fornari, Law Offices of James D. Fornari, New York City, for Plaintiff.

Peter F. Felfe, John E. Lynch, Andrew L. Tiajoloff, Felfe & Lynch, New York City, for Defendant.

## OPINION AND ORDER

GERSHON, District Judge.

This patent infringement action alleges that Schenck Corporation ("Schenck") has infringed two patents held by Acrison, Inc. ("Acrison") for a type of "loss-in-weight" feeder system. Basically, a loss-in-weight feeder system is a mechanism for discharging a liquid or powder from a hopper at a steady rate. The systems are particularly useful in the pharmaceutical industry, where small, but precise, amounts of a substance must be combined with other ingredients. Asserting non-infringement, Schenck now moves for summary judgment.

Prior to the invention of the microprocessor circuitry at issue here, a principal problem in the operation of loss-in-weight systems arose from the fact that external disturbances, which are common in an industrial plant setting, can disrupt steady outflow from the hopper. Because disturbances, such as a gust of air or a worker dropping a tool on the hopper, are arbitrary in both duration and amplitude, it was difficult, if not impossible, to anticipate them or to correct for their effects. The patented microprocessor circuitry at issue here was developed to solve this problem.

## THE DISPUTED CLAIM

Acrison has two patents for loss-in-weight circuitry systems sold under the trade name "Acrilok": 1) Reissue Patent No. 32,102 (expired October 18, 1994) and 2) Reissue Patent No. 30, 967 (expired June 17,1992). The only significant difference between the two systems is that Patent No. 32,102 ("the 102 patent") employs digital circuitry and Patent No. 30,967 ("the 967 patent") employs analog circuitry.[1] Schenck has its own patent for a loss-in-weight system, Patent No. 4,977,526, issued December 11, 1990, which carries the trade name "Multicont."

A patent document contains two distinct parts:

First, it contains a specification describing the invention "in such full, clear, concise,

and exact terms as to enable any person skilled in the art ... to make and use the same." 35 U.S.C. § 112 ... Second, a patent includes one or more "claims," which "particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112.

*Markman v. Westview Instruments, Inc.,* — U.S. —, — - —, 116 S.Ct. 1384, 1387–88, 134 L.Ed.2d 577 (1996) (citations omitted). It is the claims section that sets forth the novelty of the invention and, thus, the scope of possible infringement. *Id.* at —, 116 S.Ct. at 1388. The interpretation of claims language is "purely within the province of the court." *Id.* at —, 116 S.Ct. at 1387.

The claims of the 102 patent are written in "means-plus-function" language. *See* 35 U.S.C. § 112, ¶ 6. ("[a]n element in a claim ... may be expressed as a means for performing a specified function"). In the case of a claim so expressed, infringement is found if the accused device "employ[s] means identical or equivalent to the structures, material, or acts described in the patent specification. The accused device must also perform the identical function as specified in the claims." *King Instruments Corp. v. Perego,* 65 F.3d 941, 945–46 (Fed.Cir.1995) (citation omitted), *cert. denied,* — U.S. —, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996).

The focal point of the dispute between the parties is Element H of Claim 1 of the 102 patent. The text of Element H is set forth below:

> means for comparing a signal derived from at least one sample taken during one of said time intervals with a signal derived from at least one sample taken during another of said time intervals, for repeating said comparison for successive time intervals, so that the signal derived during each of said successive time intervals is compared with a signal derived during a different time interval, and for inhibiting the action of the control electrical signal on

---

1. For this reason, the parties generally refer just to the claims of the 102 patent, as will this opinion.

the control means when said comparison shows a difference between the compared signals beyond a predetermined limit.

Plaintiff's Ex. A at col. 17, lines 38–49. The parties disagree sharply in their interpretation of this language. Based upon its interpretation of Element H, Schenck argues that in two respects its product is as a matter of law non-infringing; the first relates to the comparison of signals which measure the flow of material, and the second relates to how the systems respond to signals which indicate a disturbance.

### The Comparison of Signals.

The Acrilok system is a means for measuring material outflow at successive time intervals and comparing the weight data obtained at those intervals. Using a microprocessor, a signal is derived from at least one weight sample taken during a first time interval (T1) and compared with a signal derived from at least one weight sample taken during a later time interval (T2). The system continues to make these comparisons through T3, T4, and so on.

It is undisputed that the Schenck system also uses a microprocessor to compare signals derived at successive time intervals based upon weight data. However, in the Schenck system, readings at successive time intervals are compared not, as in the Acrison system, with readings from prior time intervals, but with a previously derived predicted weight for the particular time interval. As set forth in the patent for the Schenck system, a signal derived from at least one weight sample taken during a first time interval is used to produce a signal that corresponds to·the expected weight to be taken during the succeeding time interval. Defendant's Ex. 3 at col. 7, line 38—col. 8, line 36.

### The Reaction to Disturbance.

Element H of the Acrison patent embodies a means for inhibiting the action of the control electrical signal when the comparison of weight signals shows a difference between the compared signals beyond a predetermined limit. In other words, when an improper variance is detected, Acrilok inhibits the action of the corrupted control signal. When the Schenck system detects an improper variance, it inhibits the formation of the corrupted control signal. Schenck characterizes the Acrison system as "shutting down" or "stopping the action" of a control signal. Acrison notes that, in fact, its system does not "shut down" the microprocessor but rather inhibits the action of a corrupted control signal. In any event, the only distinction between the two systems is that, in the Acrison system, the *action* of the control signal is inhibited, but in the Schenck system the *formation* of a corrupted signal is inhibited. Schenck does not suggest that the result under its system is different from the result in the Acrison system.

## DISCUSSION

"Summary judgment is as appropriate in patent cases as in other cases when the requirements of Rule 56 of the Federal Rules of Civil Procedure have been met." *Meyers v. Asics Corp.,* 865 F.Supp. 177, 179 (S.D.N.Y.1994) (citation omitted), *aff'd.,* 78 F.3d 605 (Fed.Cir.1996). However, "infringement is itself a fact issue," *SRI Int. v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed.Cir.1985), and therefore courts have repeatedly emphasized that patent claims "are ones in which issues of fact often dominate the scene and summary judgment is allowed only with great caution." *Garter–Bare Co. v. Munsingwear, Inc.,* 650 F.2d 975, 982 (9th Cir.1980) (citation omitted); *see also* 10A C. Wright & A. Miller, *Federal Practice and Procedure,* § 2732.1 at 313 *et passim* (1983 ed.) ("patent actions are by their very nature poorly suited for disposition by summary judgment"). Thus, for example, the Federal Circuit in *SRI Int.*reversed a grant of summary judgment where there was no dispute as to the structure and manner of operation of the plaintiff's and defendants' products, but there was a dispute as to whether the allegedly infringing product "performed the same or similar function as the claimed invention in a substantially different way." 775 F.2d at 1117.

"A patent is infringed if a single claim is infringed." *Intervet America, Inc. v. Kee–Vet Laboratories, Inc.,* 887 F.2d 1050, 1055 (Fed.Cir.1989).

## A. Literal Infringement.

■ "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly." *Amhil Enterprises Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir.1996) (citation omitted). Thus, "[i]f an express claim limitation is absent from the accused product, there can be no literal infringement as a matter of law." *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed.Cir.1994).

Schenck asserts that it does not literally infringe the terms of Claim 1 of Element H of the 102 patent. It argues that the 102 system expressly calls for the comparison of readings between succeeding time intervals, while the Schenck system conducts a comparison between a reading made at a particular interval and a previously derived predicted reading for that interval. This is a distinction that Acrison itself acknowledges. Thus, a finding of literal infringement cannot be made. That, however, does not end the matter.

## B. The Doctrine of Equivalents.

■ In *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, —— U.S. ——, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), the Supreme Court recently reaffirmed the validity of the doctrine of equivalents, which it described as follows:

> Under this doctrine, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is "equivalence" between the elements of the accused product or process and the claimed elements of the patented invention.

—— U.S. at ——, 117 S.Ct. at 1045 (citing *Graver Tank & Mfg. Co. v. Linde Products Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950)). The Court emphasized that the focus of the doctrine "must be applied to the individual elements of the claim, not to the invention as a whole." *Id.* at ——, 117 S.Ct. at 1049. In sum, "the essential inquiry" under the doctrine of equivalents is: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Id.* at ——, 117 S.Ct. at 1054.

The Supreme Court in *Warner–Jenkinson* found it unnecessary to decide whether application of the doctrine of equivalents is a task for the judge or for the jury, but found that there "was ample support in our prior cases" for the Federal Circuit's holding that it was for the jury to decide whether the accused process was equivalent to the claimed process. *Id.* at ——, 117 S.Ct. at 1053. The Court noted, however, that, "(w)here the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or summary judgment." *Id.* at —— n. 8, 117 S.Ct. at 1053 n. 8.

Although not brought to the attention of the Court by either party, a recent decision of the Federal Circuit, *Lifescan, Inc. v. Home Diagnostics, Inc.*, 76 F.3d 358 (Fed. Cir.1996), illuminates the issues in this case and points squarely to the conclusion that a reasonable jury could find that the comparison of signals in the Schenck system and the comparison of signals in the Acrison system are equivalent and that summary judgment should be denied.

In *Lifescan*, the plaintiff had patented "a method of determining the amount of test material, such as glucose, in a fluid, such as blood, by a self-monitoring method." 76 F.3d at 359. In the Lifescan system, a sample of blood is applied to one side of a test strip, and the blood passes through a "test matrix." During this passage, the glucose in the blood reacts with a chemical in the test matrix to form a dye. The red blood cells are filtered out by the strip, but the dye passes through to the other side. The process of measuring the glucose level then takes place:

> The amount of glucose in the blood is determined by measuring the reflectance at the other side of the strip, at a predetermined interval after the presence of fluid is detected on that side of the strip, and comparing it with the initial wet reflectance of the strip. This predetermined interval begins with a drop in strip reflec-

tance, which indicates that the fluid has penetrated the strip.

*Id.* at 360. Thus, the measurement is done by a comparison of reflectance when the strip initially becomes wet and reflectance after a predetermined time interval.

In the allegedly infringing Home Diagnostics ("HDI") system, a sample of blood is similarly applied to one side of a test strip and passes through a matrix, thereby allowing a dye to form. Then, once the dye passes through to the other side of the test strip, the following comparison is made:

Like the Lifescan method, the HDI method compares reflectance readings before and after the glucose in the blood has reacted with the dye-forming reagent in the matrix. However, in the HDI method the initial and final readings are not compared to each other, but to a dry reflectance that the district court found is determined at the factory and programmed into the meter.

*Id.* (footnote omitted).

For the district court, the difference of method was dispositive, and it found no infringement under the doctrine of equivalents. It "held that although the HDI method functions in the same way as the claimed invention, the HDI device differs in that it 'compare[s] the reflectance readings of the test strips, whether they are wet or dry, to a threshold reflectance reading which is programmed into the meter at the factory' " *Id.* at 361. Or, as the Federal Circuit explained, "[i]n both devices it is the amount of drop in reflectance that is measured, but in the HDI device both the initial 'wet' reflectance after the plasma penetrates to the far side of the matrix and the reflectance after the incubation period, are compared to the 'standard' instead of directly to each other." *Id.*

The Federal Circuit upheld the district court's finding of no literal infringement, but reversed the grant of summary judgment under the doctrine of equivalents. For the appellate court, the difference in the precise methods of comparison was overshadowed by the essential equivalence of what was being compared:

Lifescan proffered substantial evidence that HDI's taking of the predetermined dry reflectance reading and programming it into the meter is the equivalent of claim 1 "taking a first reflectance reading from a dry first surface of said porous matrix prior to application of a sample of body fluid." In both cases the dry reading provides the base by which it is determined when the fluid has penetrated the matrix.... [A] reasonable jury could have deemed it equivalent to determine the dry reflectance in advance, the meter then comparing the "before" reading, taken at the factory, with subsequent readings taken during use. *Both methods first compare dry and wet reflectance measurements, and then compare the reflectance when the dye has incubated, based on identical timing.*

*Id.* at 362 (emphasis added).

The logic of *Lifescan* is applicable here. Just as the two systems at issue in *Lifescan* performed comparisons based on dry and wet reflectance, the two systems at issue here perform comparisons of weight readings derived at different time intervals. That the Schenck system, like the HDI system, involves a "standard," or previously determined, measurement in the comparison does not warrant a finding of summary judgment under the doctrine of equivalents.

Schenck asserts that the rule of "file history estoppel," which is "a well-established limit on non-literal infringement," *Warner–Jenkinson*, —— U.S. at ——, 117 S.Ct. at 1049, precludes a finding that the 102 system and the Schenck system can be equivalents. The rule "precludes a patentee from obtaining in an infringement suit patent protection for subject matter which it relinquished during prosecution in order to obtain allowance of the claims." *Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291 (Fed.Cir.1995) (citation omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996).

Schenck argues that during the prosecution of the 102 patent Acrison created an estoppel limiting the range of the 102 patent claims to an apparatus that compares *rates*, thereby expressly relinquishing coverage of

microprocessor circuitry that might compare data other than rates. Schenck here relies on the following language in an Amendment, dated March 7, 1985:

> Claims 1, 5 and 35 all describe a machine in which signals related to the actual feed *rate* from different time intervals are compared with each other to determine the existence of an extraneous disturbance; ... Such a comparison of rate signals ... over time gives a second differential of the weight signal, in other words, an acceleration signal.

Defendant's Ex. 7 at 22–23 (emphasis in original). As Acrison correctly argues, however, this language does not support Schenck's assertion. That is, the quoted passage "does not state that the claims are *limited to* the use of rate signals, or even to signals that are related to the feed rate." Acrison Memorandum at 13 (emphasis in original). Indeed, in an "Office Action," dated September 9, 1985, allowing the claims of the 102 patent, the Patent Examiner made no reference to "rate signals," but instead defined the comparison performed by the 102 system as simply being between "the signal derived during each time interval with the signal derived during the immediately preceding time interval...." Plaintiff's Ex. C at 12. Thus, Schenck's argument with respect to file history estoppel is without merit.[2]

Schenck's second asserted distinction between Element H and the Schenck system is also insufficient to justify summary judgment under the doctrine of equivalents. Schenck argues that the reactions of the 102 system and the Schenck system to the occurrence of a disturbance differ sufficiently that they are not equivalent. According to Schenck, the 102 system "stops the action" of a control signal, and the Schenck system, in contrast, "inhibits the formation" of a control signal. To begin with, there is a factual issue as to whether the 102 system "stops the action" of a control signal. But even accepting that

there are differences between the two systems, they are insufficient to take the issue from the jury. The disputed element, Element H, provides a means "for inhibiting the action of the control electrical signal on the control means when said comparison shows a difference between the compared signals beyond a predetermined limit." By Schenck's own description of what its system does when "comparison shows a difference between the compared signals beyond a predetermined limit," a reasonable jury could find equivalence with Element H. *See Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1533 (Fed.Cir.1987) (a "substantial equivalent" of a patented product is one that fails to "substantially change the way in which the function of the claimed invention is performed"); *Stryker Corp. v. Intermedics Orthopedics, Inc.,* 891 F.Supp. 751, 792 (E.D.N.Y.1995) (infringement may be found "when the accused device performs substantially the same function in substantially the same way to achieve substantially the same result" as does the patent in suit; citation omitted), *aff'd.,* 96 F.3d 1409 (Fed. Cir.1996).

■ Some final arguments by Schenck are now addressed. Schenck argues that it has obtained a patent on its system and that "this independent patentability clearly establishes that the Schenck Multicont is *not* equivalent to the system of the 102 patent." Schenck's Memorandum at 28 (emphasis in original). But, that an allegedly infringing device is covered by its own patent is merely probative, not dispositive, of a finding of non-infringement. *See, e.g., Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 954 (Fed. Cir.1993). Here, for the reasons set forth above, there remains an issue of fact as to infringement.

Finally, Schenck asserts that it cannot be found to have infringed both the 102 patent and the 967 patent because the equivalence that can be asserted by Acrison is limited by

**2.** Throughout its papers, Schenck attempts to distinguish Acrison's system by saying that it compares "rate signals" rather than the weight signals used by Schenck. This terminology is misleading because it suggests that the Acrison system compares one rate to another. It does not. Rather, both systems compare weights. Insofar as Acrison refers to the rate derived from these weight signals as a "rate signal," it means only that the weight signals, taken in succession, indicate a rate of flow. There is simply no *comparison of rates,* that is, of one rate to another rate. In both systems, there is only a comparison of weights.

an estoppel arising from Acrison's obtaining the 102 patent for the digital version of the analog system covered by the 967 patent. Schenck seems to be arguing that, if the systems patented under 967 and 102 were separately patentable, then they were not equivalent, and therefore its system is separately patentable too. Schenck has offered no authority for the conclusion it urges upon the court. On the contrary, Schenck offers no reason why the jury cannot find infringement as to both of Acrison's patents.

## CONCLUSION

Schenck's motion for summary judgment is DENIED.

**SO ORDERED.**