ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
WILKEN, District Judge.
Defendant US/Intelicom, Inc. (USI) moves for summary judgment that claims one, two, four through seven, nine through eleven, eighteen, twenty through twenty-seven, twenty-nine and thirty of Plaintiff Telemac Corporation’s (Telemac) U.S. Patent No. 5,577,100 (’100 patent) are invalid. Telemac opposes the motion and cross-moves for partial summary judgment that none of the claims of the TOO patent are invalidated by U.S. Patent No. 5,748,720 (Loder patent). Telemac moves for summary judgment that claims two, five, seven, ten, eleven and twenty-five through twenty-seven of its TOO patent have been infringed by USI. USI opposes this motion and cross-moves for summary judgment that it has not infringed any claim of Tele-mac’s TOO patent.
The matter was heard on January 12, 2001. Having considered all of the papers filed by the parties and oral argument, the Court GRANTS USI’s motion on the validity of the TOO patent in part and DENIES it in part and GRANTS Telemac’s cross-motion. Furthermore, the Court DENIES both motions for summary judgment on infringement.
STATEMENT OF FACTS
I. General Background
Conventional cellular phones operate on a credit system, similar to a credit card. The cellular phone carrier permits its customers to use its airwaves and amass *1071 charges. At the end of the month, the carrier sends a bill for the amount of the charges. This system operates on the assumption that the customer is creditworthy, and thus excludes those with poor credit ratings.
Telemac is a Delaware corporation with its principal place of business in California. When the company was formed in the early 1990s, it initially focused on the rental cellular phone market, and sought to find a way to minimize the credit risk for carriers. Telemac developed a cellular telephone accounting system, U.S. Patent No. 5,325,418 (’418 patent), which allows the. phones to record the phone number and call duration for each call as it is made. With this technology, when the customer returns the phone, the rental carrier can prepare and present a bill and receive payment immediately.
In 1992, Telemac began work on debit phone technology that would further reduce the credit risk to the carrier by permitting pre-payment by customers. Tele-mac developed a mobile phone system that: (1) stores rate information for different types of calls, (2) uses a complex billing algorithm to apply the appropriate rate to each call to determine the actual charge for the call and (3) uses a debit account stored in the phone to subtract charges for the call from a prepaid account amount. This system also includes a carrier, or system provider, with a centralized computer known as a host processor. The host processor stores information about the identity of each mobile phone, the account history for the customer and the computer codes necessary to control the mobile phone. The system provider thus can communicate directly with the mobile phone user and/or mobile phone to activate and program the phone and to replenish the debit account.
On January 30, 1995, Telemac filed a patent application claiming its debit mobile phone technology. On November 19, 1996, the United States Patent and Trademark Office (PTO) issued Telemac the TOO patent for this technology. See Decl. and Initial Expert Report of Dr. Theodore S. Rappaport in Support of Motion for Summary Judgment on Invalidity (Rappaport Validity Decl.), Ex. B at Tab 4. The present dispute centers primarily on claim one of the TOO patent, which describes:
A mobile phone system comprising a system provider having a host processor unit and a plurality of system users each having at least one mobile phone wherein:
the host processor unit has communication means for selectively establishing a communication link with each mobile phone unit; and
each phone unit includes a processor, a clock chip, a memory associated with the processor, program means including a complex billing algorithm and rate data for internally calculating call charges as calls are made, wherein the phone unit includes internal accounting means for generating a debit account with an account amount in the phone unit and decrementing the account amount in the debit account in real time, and wherein the system provider has payment verification means under system provider control for setting a phone use account amount and communicating the account amount to the phone unit, wherein the internal accounting means adds the account amount to the debit account.
Id. at 19:2-21. Although the parties also dispute claims two, four, five, six, seven, nine, ten, eleven, eighteen, twenty through twenty-seven, and twenty-nine, all of these claims are dependent upon claim one.
Prior to filing the instant suit against USI, Telemac filed suit in this Court *1072 against Topp Telecom Inc. (Topp), alleging infringement of the ’100 patent. In that suit, the Court construed claim one of the ’100 patent. The Court then concluded that claim one was invalid as anticipated by U.S. Patent No. 5,631,947 (Wittstein patent). The Court concluded that dependent claims four, six, nine, eighteen, twenty through twenty-four, twenty-nine, and thirty were also anticipated by the Witt-stein patent. The Court subsequently granted Topp’s motion for summary judgment on Telemac’s patent infringement claim, concluding that Topp’s product lacked both the “complex billing algorithm” and “communication means” claim limitations of the ’100 patent.
Telemac appealed the Court’s claim construction, anticipation and non-infringement rulings to the Federal Circuit. Topp cross-appealed. After the claim construction hearing in this case, Topp’s cross-appeal was dismissed and this Court’s rulings were affirmed. See Telemac v. Topp, 247 F.3d 1316 (Fed.Cir.2001).
On May 5, 1999, Telemac sued USI, alleging that USI has infringed, contributed to the infringement of and actively induced others to infringe Telemac’s ’100 patent by making, using and selling in the United States infringing cellular telephone products and services, including USI’s “USI-100” and the “Uniden PCD-2000A” cellular telephone systems. USI counterclaimed that Telemac’s ’100 patent is invalid because the claims are anticipated by or obvious in light of the prior art and fail to comply with the requirements of 35 U.S.C. § 112. USI also counterclaimed that it had not infringed any of the claims of the ’100 patent. During the Markman[1] proceedings, the Court rejected USI’s indefiniteness claim and construed claims one, two, seven, twenty-six, and twenty-seven of the ’100 patent. The Court reaffirmed its prior conclusion that claim one of the ’100 patent, along with dependent claims four, six, nine, eighteen, twenty, twenty-one, twenty-three, twenty-four, twenty-nine, and thirty, are invalid as anticipated by the Wittstein patent.[2] See Telemac v. USI, September 6, 2000 Order Construing Claims at 23. For that reason, the Court did not construe the invalid dependent claims.
USI now moves for summary judgment that: 1) the Loder patent anticipates claims one, four through seven, nine through eleven, eighteen, twenty through twenty-seven, and twenty-nine of the ’100 patent and 2) the Wittstein patent anticipates claims two and five of the ’100 patent. Telemac cross-moves for partial summary judgment that none of the claims of its ’100 patent are invalidated by the Lo-der patent.
Telemac moves for summary judgment that USI, through its host software and the handsets it enables (collectively hereinafter USI-enabled handsets), has infringed, as a matter of law, claims two, five, seven, eleven, and twenty-five through twenty-seven of Telemac’s ’100 patent. USI cross-moves for summary judgment that USI has not infringed any claim of the ’100 patent.
II. The Loder Patent
A. The host processor unit has communication means for selectively establishing a communication link with each mobile phone unit
USI’s expert, Dr. Theodore S. Rappa-port, testifies that based on the Loder *1073 patent, his review of The GSM System for Mobile Communications, by Michel Mouly & Marie-Bernadette Pautet, and the GSM Specifications, he believes the Loder patent “described ways in which the system provider controlled usage of a handset identified by the host as part of the system provider’s network.” See Rappaport Invalidity Deck, ¶ 27 and Ex. C at 2. He also believes that the Loder patent “taught host processor units that could communicate a value of prepaid funds and charging information such as tariff rates to a prepaid cellular phone, which would then store this data in the memory located within the Subscriber Identity Module (SIM).” Id., and Ex. C at 1.
Dr. Rappaport states that because the Loder patent describes a network and a plurality of mobile phone units, “at least one of the computers connected to the network could be called a host processor.” Id., and Ex. C at 2. He says that the GSM Specifications taught “how to communicate data securely, over the network, from a host to any properly registered handset, and alter the memory in the SIM in a manner that would control usage of the handset.” Id. In making this assertion, Dr. Rappaport relies on the Loder patent’s description of the network’s ability to send the call charge information to the mobile radio terminal unit along with a request for an acknowledgment from the SIM if it has sufficient prepaid funds stored in its memory. See id. (citing Loder patent 2:52-3:26). Dr. Rappaport also states that the network has the ability to terminate a call if the handset runs out of money. See id. In support of this statement, he relies on the Loder patent’s description of the SIM’s capability, after checking the value of prepaid funds stored in its memory, to determine not to send an acknowledgment to the network’s call charge message if funds are not available. See id.
Telemac’s expert, Mr. Stephen D. Bris-tow, testifies that he believes that Dr. Rap-paport has confused “the computers which the network or wireless service provider have to place telephone calls” with the host processor disclosed in the ’100 patent. Declaration and Expert Report of Stephen D. Bristow Concerning Validity (Bristow Validity Decl.), ¶ 25. Mr. Bristow further testifies that the Loder patent, while suggesting communications between the mobile phone units and network computers, includes only a “cryptic statement” about a “programming device” that can be used to program funds into the SIM card at the point-of-sale retailer or manufacturer. Id. However, Mr. Bristow claims, “There is no indication that this programming device is a host processor, that it belongs to the system provider or is connected with the cellular telephone network.” Id.
Mr. Bristow also testifies that the Loder patent does not disclose a host processor “which stores identification information about each mobile phone unit to allow it to ‘selectively’ establish a communication link with each mobile phone unit.” Id. Rather, Mr. Bristow testifies, the programming device, described in the Loder patent, does not make contact with the phone unit but with the SIM. He explains that “the SIM cards are programmed as stand-alone cards after being removed from the reading device, not while in the reading device.” Id. The reading device is either attached to or incorporated into the phone unit. See id. The Loder patent specifically states, in referring to the GSM system, “The mobile subscriber is able to use different mobile equipment ... but is all the time using the same SIM card and thereby can be reached at the same subscriber number.” Id., Ex. 2 (Loder patent), 5:24-28. Moreover, Mr. Bristow testifies that the Loder patent does not teach a “communication link” with the mobile phone unit or even suggest that the “program *1074 ming device would have any stored identification information about the mobile phone unit to make its SIM card communications ‘selective’ for a particular mobile phone unit.” Id., ¶25. Therefore, Mr. Bristow testifies, the Loder patent does not disclose a host processor with the communication means for establishing a communication link with each phone unit. See id.
B. Complex Billing Algorithm
Dr. Rappaport testifies that the Loder patent describes a complex billing algorithm and teaches that the handset can internally calculate and decrement the internal account balance for each call made. See Rappaport Validity Deck, ¶ 27 and Ex. C at 3. Dr. Rappaport also testifies that “Loder taught that tariff rates could be retrieved either from preprogrammed memory in the SIM or by receiving tariffs over-the-air in the form of e-parameters transmitted by the network operator.” Id. The Loder patent, referring to a feature in the GSM System, describes the ability of the mobile phone unit to receive an e-parameter from the system during the call set-up. See id., Ex. B at Tab 7 (Loder patent), 6:35-45. E-parameters are the charging information for a call based on its destination. See id. Dr. Rappaport’s view is that the Loder patent described its complex algorithm by referring to GSM Specification 2.24, which “described tariffs that varied depending upon destination” and included a “mark-up” when roaming. Id., ¶ 27 and Ex. C at 3-4. Dr. Rappaport believes a person skilled in the art would conclude from the Loder patent and the GSM Specification 2.24 that the handset could calculate local, long distance, international, and roaming calls. See id.
Mr. Bristow testifies that the Loder patent merely taught a single tariff rate that can be pre-programmed into the SIM or sent by the network to the SIM. See Bris-tow Validity Deck, ¶ 26. He states, “There is simply no mention or suggestion in the Loder patent of placing a billing algorithm into the telephone which can classify calls into the categories of local, long distance, roaming or international, retrieve a rate appropriate [sic] the particular category, and then calculate charges based upon that chosen rate.” Id. Mr. Bristow testifies that “it is essential that the complex billing algorithm be stored within the mobile telephone unit.” Id. He also testifies that the Loder patent does not disclose debiting the account in real time. See id.
C. Payment Verification Means
Dr. Rappaport testifies that the Loder patent teaches that the SIM, able to store permanently the value of prepaid funds, could be programmed with any value, reprogrammed to reflect changes in value, and could decrement the value of prepaid funds in real time according to the value of real time calls. See Rappaport Validity Deck, ¶ 27 and Ex. C at 4. Dr. Rappaport further testifies that the Loder patent “specifically taught that the system provider can set and program a defined amount into a memory location in the SIM.” Id.
However, Mr. Bristow testifies that “it is the point-of-sale retailer or SIM card manufacturer who is responsible for programming funds into the SIM card” in the Loder patent. Bristow Validity Deck, ¶ 27. According to Mr. Bristow, Dr. Rap-paport claims that the Loder computer network is the system provider. See id. But Mr. Bristow states that, even if the Loder computer network is the system provider, it is far from clear that the point-of-sale retailer is the same entity as the computer network in the Loder system. See id. Mr. Bristow states, “A crucial advance in the TOO patent is giving the system provider, through its centralized host processor, control over all amounts *1075 which are funded into the debit account of mobile phones.” Id.
III. USI’s Telephone System
In approximately 1996, USI developed its telephone system comprising mobile telephone handsets with programmed features enabling them to act as prepaid debit phones. See Declaration and Initial Expert Report of Dr. Theodore S. Rappaport In Support of Motion for Summary Judgment for Infringement (Rappaport Infringement Decl.), ¶¶ 6-9.
A. Communication Means for Selectively Establishing A Communication Link
Dr. Rappaport testifies that USI-enabled handsets are capable of storing a profile of the user. See Rappaport Infringement Decl., ¶¶ 21-23 Ex. A (USI’s Dealer Manual) at USI6763. The user profile includes the identity of the user, which consists of the electric serial number (ESN) for the phone, the telephone number or mobile identification number (MIN), the USI software revision number, and the current personal identification number (PIN). See id., ¶23 and Ex. A (USI’s Dealer Manual) at USI6764. This user identity information is stored in the number assignment module (NAM). See id. The user profile also includes the system identifier (SID), the billing information, the options and the statistics. See id. Dr. Rappaport further testifies that the USI host processor has the ability to communicate data to the handset using Dual Tone Multi-Frequency (DTMF) signals. See id., ¶¶ 21-23 and Ex. B. (Deposition of Jonathan Kevin O’Neal, USI’s Chief Technology Officer) at 328:21-329:8. He then testifies that one way a user may activate and program a USI-enabled handset is to call an 800 number from a phone other than the USI-enabled handset and receive instruction on how to program the NAM parameters manually. See id., ¶ 21 and Ex. B (O’Neal Depo.) at 71:1-18.
However, Mr. Bristow testifies that although USI-enabled handsets can be activated and programmed manually, USI has also developed an automated process for activating and programming USI-enabled handsets. See Bristow Infringement Decl., ¶¶ 19-21, Ex. 8 (O’Neal Depo.) at 67-70, 210-215, 324-327, and Ex. 33 (Deposition of David C. Holmes, Senior Manager at Western Wireless) at 26-33. He further testifies that during the automated activation process, when the user punches the MEM 8 key to dial the prepro-grammed 800 number, the host processor sends back a DTMF message to the handset. See id., ¶¶ 19-21 and Ex. 8 (O’Neal Depo.) at 382-384. Mr. Bristow explains that then the host processor downloads the user profile information, described by Dr. Rappaport, to the handset. See id., ¶¶ 19-21, Ex. 8 (O’Neal Depo.) at 67-70 and Ex. 33 (Holmes Depo.) at 26-33. Mr. Bristow also points to USI’s presentation to its customers Western Wireless and Sprint describing the features of USI-enabled handsets. In them, USI depicts its over-the-air technology and lists NAM programming as one of its capabilities. See id, Ex. 22 (USI’s presentation to Western Wireless) at 16, Ex. 23 (USI’s slide presentation to Sprint) at 5.
B. Complex Billing Algorithm
Dr. Rappaport testifies that USI-enabled handsets do not include the complex billing algorithm element because they usually cannot place international calls. See Rappaport Infringement Deck, ¶ 40. Although USI-enabled handsets can place calls to Canada and the Caribbean, Dr. Rappaport believes that these are not international calls, as defined by the TOO patent. See id., ¶¶ 39-40 and Ex. B (O’Neal Depo.) at 117:3-12. He states *1076 that USI-enabled handsets usually are prohibited from making international calls other than those to Canada and the Caribbean. See id. In making this claim, he relies on the fact that the system provider must program USI-enabled handsets to recognize a wildcard template before such international calls can be made. See id., ¶ 40, Ex. A (USI Dealer Manual) at USI6747 and Ex. B (O’Neal Depo.) at 116— 119. Dr. Rappaport further testifies that USI-enabled handsets that are not programmed to recognize a wildcard template for international calls, do not store a rate for an international call, and cannot calculate the cost to be applied to an international call. See id., ¶ 41. A wildcard template is a pattern of characters that system providers can program into the handsets to allow the handsets to recognize, make and charge for international calls. See id., ¶ 40, Ex. A (USI Dealer Manual) at USI6753-54 and Ex. B (O’Neal Depo.) at 117. According to the USI Dealer Manual, all USI-enabled handsets can be programmed to recognize wildcard templates. See id., Ex. A (USI Dealer Manual) at USI6752.
Mr. Bristow testifies that USI-enabled handsets include the complex billing algorithm because they can identify calls as local, long distance, roaming, and international calls, and calculate the applicable rate for each. See Bristow Infringement Decl., ¶ 22, Ex. 8 (O’Neal Depo.) at 65-67 and 78-85 and Ex. 33 (Holmes Depo.) at 25-26 and 33. He testifies that USI-enabled handsets allow users to make calls to Canada and the Caribbean, which he says are international calls, without a wildcard template programmed. See id. He states that USI-enabled handsets merely require the programming of wildcard templates in order to allow users to place other international calls. See id.
C. Internal Means for Generating a Debit Account With an Account Amount in the Phone Unit
Dr. Rappaport testifies that USI-enabled handsets decrement in “units” that are not monetary units. Rappaport Infringement Deck, ¶¶ 35-37 and Ex. A (USI Dealer Manual) at USI6749. Although some USI-enabled handsets label the units as dollars, Dr. Rappaport believes, “The label, ‘dollars’ also does not change anything about the way in which the USI-enabled handset adds units or decrements units from the internal account.” Rappa-port Infringement Deck, ¶ 36.
Mr. Bristow states that USI-enabled handsets can be funded in either prepaid dollars or prepaid units, which represent prepaid dollars. See Bristow Infringement Deck, ¶ 25 and Ex. 8 (O’Neal) at 86-88 and 280:14-18. Mr. O’Neal testifies, “If the outgoing call is determined to be a long distance rate, the long distance rate is deducted from the balance on the handset once per minute for the duration of the calk” Bristow Infringement Deck, ¶ 13 and Ex. 8 (O’Neal Depo.) at 110:10-15.
D. Clock Chip
Dr. Rappaport states that the timing function in a mobile phone handset could be performed either by processor-controlled software or by hardware in a “dedicated timing chip.” Rappaport Infringement Deck, ¶¶ 31-33. He testifies that a USI-enabled handset does not include a clock chip; rather, its microprocessor executes a software routine to calculate the duration of a calk See id., ¶ 27 and Ex. B (O’Neal Depo.) at 99-100. He further testifies, “The USI timing software never executes on a separate timing device or obtains data from a separate timing device.” Id., ¶ 27 and Ex. B (O’Neal Depo.) at 113:24-114:23. However, Dr. Rappaport relies for this conclusion on the testimony *1077 of Mr. O’Neal who states only that the microprocessor’s software routine is executed based upon periodic interrupts. See id., Ex. B (O’Neal Depo.) at 114:13-23.
Mr. Bristow asserts that Telemac’s experts dismantled two USI-enabled handsets and found that both handsets had a Kyocera clock chip which was separate and apart from the microprocessor. See Supplemental Declaration of Stephen D. Bris-tow Concerning Summary Judgment Cross-Motions (Bristow Supp. Decl.), ¶ 3. He disputes Dr. Rappaport’s differentiation between the software calculating the duration of phone calls and the clock chip proving the timing function. See id., ¶ 3-5. Mr. Bristow testifies that “the main purposes of the type of Kyocera clock chips used on USI’s phones is to generate pulses to control the timing and operation of logic circuitry (i.e., the processors in USI’s phones).” Id., ¶ 4. USI concedes in its surreply that the Kyocera oscillators provide a timing reference for its handsets. See USI Surreply Regarding Infringement at 2.
DISCUSSION
I. Legal Standard for Summary Judgment
Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. See Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Eisenberg v. Insurance Co. of North America, 815 F.2d 1285, 1288-89 (9th Cir.1987).
The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party’s evidence, if supported by affidavits or other evidentiary material. See Celotex, 477 U.S. at 324, 106 S.Ct. 2548; Eisenberg, 815 F.2d at 1289. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Intel Corp. v. Hartford Accident and Indem. Co., 952 F.2d 1551, 1558 (9th Cir.1991).
Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
“ ‘Summary judgment is as appropriate in a patent case as in any other’ when it is shown that no genuine issue of material fact remains for decision and that the movant is entitled to judgment as a matter of law.” D.M.I., Inc. v. Deere & Co., 755 F.2d 1570, 1573 (Fed.Cir.1985) (quoting Barmag Barmer Maschinenfabrik A.G. v. Murata Mach., Ltd., 731 F.2d 831, 835 (Fed.Cir.1984)).
II. Legal Standard for Invalidity
Because patents are presumed to be valid, the party seeking to prove invalidity bears the burden of demonstrating by clear and convincing evidence that the patent is anticipated. See 35 U.S.C. § 282; Kegel Co., v. AMF Bowling, Inc., 127 F.3d 1420, 1425 (Fed.Cir.1997); National Presto Indus. v. The West Bend Co., 76 F.3d 1185, 1189 (Fed.Cir.1996). An individual is entitled to a patent unless “the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the application for patent.” 35 U.S.C. § 102(e).
*1078 In determining validity, the “ ‘first step involves the proper interpretation of the claims. The second step involves determining whether the limitations of the claims as properly interpreted are met by the prior art.’ ” Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1574 (Fed.Cir.1995) (quoting Beachcombers, Int’l, Inc. v. WildeWood Creative Prods., Inc., 31 F.3d 1154, 1160 (Fed.Cir.1994)). “Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference.” Scripps Clinic & Research Fdn. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed.Cir.1991) (“There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention”); Hazani v. U.S. Intern. Trade Com’n, 126 F.3d 1473, 1477 (Fed.Cir.1997).
As to a means plus function element, “absent structure [in a prior art reference] which is capable of performing the functional limitation of the ‘means,’ [the prior art reference] does not meet the claim.” RCA Corp. v. Applied Digital Data Systems, Inc., 730 F.2d 1440, 1444 (Fed.Cir.1984)(quoting In re Mott, 557 F.2d 266, 269 (C.C.P.A.1977)).
III. Legal Standard on Infringement
The Federal Circuit has held that “in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device.” Zygo Corp. v. Wyko Corp., 79 F.3d 1563, 1568 (Fed.Cir.1996) (citing Lemelson v. United States, 752 F.2d 1538, 1551 (Fed.Cir.1985)). To determine whether a patent is infringed: (1) the court must interpret the claims of the patent; and (2) the trier of fact must compare the properly construed claims to the accused device. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed.Cir.1995), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). “Infringement, both literal and under the doctrine of equivalents, is an issue of fact.” Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed.Cir.), cert. denied, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). “The plaintiff has the burden of proving infringement by a preponderance of the evidence.” Kegel, 127 F.3d at 1425.
“To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly;” the absence of a single element will preclude a finding of infringement. Southwall, 54 F.3d at 1575.
“A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device.” Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1423 (Fed.Cir.1997). “A claim element is equivalently present in an accused device if only ‘insubstantial differences’ distinguish the missing claim element from the corresponding aspects of the accused device.” Id. However, as the Supreme Court has noted, “It is important to ensure that the application of the doctrine [of equivalents], even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.” Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 37, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); see also Sage Products, 126 F.3d at 1424.
To determine whether an accused device infringes a means-plus-function claim term literally or under the doctrine of equivalents, a court must look to “whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent *1079 of the corresponding structure described in the patentee’s specification as performing that function.” C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1363 (Fed.Cir.1998) (citing D.M.I., 755 F.2d at 1575).
The Federal Circuit recently significantly limited the application of the doctrine of equivalents. See Festo Corporation v. Shoketsu Kinzoku Kogyo Kabushiki, 234 F.3d 558 (Fed.Cir.2000). In Festo, the court ruled that when a paten-tee has narrowed a claim by amendment, for any reason related to patentability or when no explanation is provided for the amendment, prosecution history estoppel completely bars the application of the doctrine of equivalents to that claim. See id. at 574.
Infringement will be found where a party directly infringes, contributorily infringes, or induces others to infringe. 35 U.S.C. § 271.
The Federal Circuit has held that “the issue of infringement is amenable to summary judgment only when there is no genuine dispute of material fact as to whether correctly interpreted claims read upon the accused device or method, literally or under the doctrine of equivalents.” Lifescan, Inc. v. Home Diagnostics, Inc., 76 F.3d 358, 359 (Fed.Cir.1996).
IV. Anticipation of TOO Patent’s Claims at Issue by the Loder Patent
A. The host processor unit has communication means for selectively establishing a communication link with each mobile phone unit
In this case, the Court has construed the meaning of “communication means for selectively establishing a communication link with each mobile phone unit” as it did previously in the Telemac v. Topp litigation. See Telemac v. USI, September 6, 2000 Order at 7-15 (citing Telemac v. Topp, February 5, 1999 Order Construing Claims and Granting Defendant’s Motion for Partial Summary Judgment at 5-11). Based on the plain language of claim one, the Court found that the TOO patent requires that the “communication link” be initiated by the host processor. See id. In addition, the Court found that the term “communication link” refers only to automatic communications, ie., communications between the host processor and the mobile phone unit. See id. at 8. Finally, the Court found that communication means refers only to the means for establishing a link for the purpose of activating and programming the customer’s phone. See id. The Court contrasted the payment verification means, which it found refers to the means by which the host processor can initiate an updating of the account amount. See id. “The TOO patent refers to the ‘communication link’ only in regard to the communication means, not the payment verification means.” See id. Lastly, the Court construed the claim to mean that the claimed communication means must be part of or controlled by the host processor. See id. at 15.
Telemac is correct that the Loder patent merely teaches communications from a programming device to the SIM, which occurs either at the point-of-sale retail facility or at the factory. Moreover, Telemac is also correct that the Loder patent teaches that the SIM cards are programmed as stand-alone cards and then must be read by a reading device, which is either attached to or incorporated into the phone. Further, the Loder patent describes communications that are .not selective for a particular mobile phone unit because, as the Loder patent describes, the mobile subscriber may use his or her SIM card in different phone units.
Therefore, the Loder patent does not disclose a host processor with the communication means to selectively establish a *1080 communication link with each mobile phone unit, as described in the ’100 patent.
B. Complex Billing Algorithm
The Court previously construed the ’100 patent’s “complex billing algorithm” element to require that the handset be capable of calculating call charges for local, long distance, roaming, and international calls. See Telemac v. USI, September 6, 2000 Order at 17-18 (citing Telemac v. Topp, February 5, 1999 at 15-17). The Loder patent makes no mention of local, long distance, and international calls.
Nonetheless, USI argues that the Loder patent teaches that the handset can internally calculate the cost of every call made by customers and decrement the internal account balance of prepaid funds in real time. USI claims that when long distance or roaming calls are made, tariff rates can be retrieved either from the SIM’s pre-programmed memory or over-the-air in the form of e-parameters, which will be sent to the SIM. Although USI admits that the Loder patent does not describe the capability to distinguish among local, long distance, roaming and international call rates, it maintains that a person with skill in the art and familiarity with the GSM Specifications would have thought that such a description was unnecessary.
However, Telemac is correct that the Loder patent fails to teach that the handset can internally calculate local, long distance, roaming and international rates. Rather, the Loder patent merely teaches that the mobile phone unit can receive call charge information in the form of e-parameters that the computer network has calculated based upon the destination of the call. Therefore, the Loder patent fails to disclose the complex billing algorithm element of claim one.
C. Payment Verification Means
The Court previously construed this element, finding that payment verification means describes the process of updating the debit account amount. See Telemac v. USI, September 6, 2000 Order at 23 (adopting the claim construction in Telemac v. Topp, February 5, 1999 Order at 11-12). In construing this element, the Court previously adopted Telemac’s proposed construction of the “payment verification means” claim element, which
refers to system provider controls directly implemented at a transaction station or over the airways to communicate amounts to be placed in the debit account and verify those amounts have been paid for. This ‘means-plus-function’ element is to be construed to cover the instruction disclosed in the specification for ‘setting a phone use account amount and communicating the account amount to the phone unit.’
Weatherly Decl, Ex. 1, Tab J (Telemac v. Topp, Joint Claim Construction Brief) at 7.
USI argues that the Loder patent teaches a SIM having a memory location for permanently storing a value of prepaid funds, and that the programmer of the SIM can set an account amount and communicate that amount to the memory location in the SIM. Furthermore, USI claims that the GSM Specifications teach skilled artisans how to communicate data securely over the network from a host to any properly registered handset, and how to alter the memory in the SIM in a manner that would control usage of the handset.
However, Telemac persuasively argues that in the Loder patent it is the manufacturer of the SIM or the point-of-sale retailer, not the system provider, who controls programming the prepaid funds on the SIM cards. Telemac is correct that a crucial part of the TOO patent’s payment verification means claim element is that *1081 the system provider, through its host processor, has the ability to verify all amounts which are funded into the debit accounts of mobile phone units. The Loder patent does not teach the direct communications from the system provider to the mobile phone unit to fund debit accounts or that the system provider has control over the point-of-sale retailer’s programming of funds on the SIM cards. Therefore, the Loder patent fails to disclose the payment verification means of claim one.
Accordingly, the Loder patent does not anticipate claim one of the TOO patent because it fails to disclose the communication means, complex billing algorithm, and payment verification means elements of claim one. Because not all of the elements of claim one are found in the Loder patent, claim one is not anticipated. See Scripps, 927 F.2d at 1576.
Because claims four through seven, nine through eleven, eighteen, twenty through twenty-seven, and twenty-nine are dependent upon claim one, these claims are also not invalid as anticipated by the Loder patent. Therefore, none of the TOO patent claims is invalid as anticipated by the Lo-der patent.
V. Anticipation of TOO Patent Claims Two and Five by the Wittstein Patent
The Court previously ruled that the Wittstein patent anticipates claims one, four, six, nine, eighteen, twenty, twenty-one, twenty-three, twenty-four, twenty-nine, and thirty of TOO patent. See Telemac v. USI, September 6, 2000 Order at 23. USI asks the Court to find further that the Wittstein patent anticipates claims two and five of the TOO patent. Telemac does not respond to USI’s arguments other than to reassert its view that the Court was incorrect in its earlier ruling. The Court is not persuaded and finds that the Wittstein patent anticipates claims two and five of the TOO patent.
VI. Cross Motions for Summary Judgment of Infringement
Telemac claims that USI has infringed claims two, five, seven, ten, twenty-five, twenty-six, and twenty-seven of its TOO patent by copying the debit telephone inventions disclosed and claimed in that patent. USI responds that USI telephone systems lack the communication means, complex billing algorithm, internal accounting means and clock chip limitations of claim one of the TOO patent. Because each of the claims at issue depends from claim one, the absence of any of these limitations will preclude a finding of infringement. See Zygo, 79 F.3d at 1568.
A. Direct Versus Indirect Infringement
Telemac alleges that USI directly infringes its TOO patent by operating a mobile phone system which reads on several of the TOO patent’s claims. USI claims that it cannot be liable for direct infringement because USI does not make, sell, use, offer for sale, or import a mobile phone system. However, to avoid the addition of Pre-Cell Solutions and Pre-Paid Solutions as parties to this action, on August 4, 2000, USI stipulated, “Any actions taken by Pre-Cell or Pre-Paid on or after April 5, 2000 in concert with USI or involving USI’s accused technology may, for purposes of proving liability, be imputed to USI as if they were done by USI itself.” See Telemac v. USI, August 4, 2000 Stipulation at 2. Telemac asserts, without opposition, that Pre-Paid is currently operating a debit telephone system by selling phones with USI software and fully servicing those phones by, among other things, performing all the necessary activation and programming functions. See Hanley Deck, ¶ 12.
Thus, because Pre-Paid’s liability is imputed to USI, USI is liable for direct *1082 infringement if Telemac proves Pre-Paid directly infringed.
B. Communication Means for Selectively Establishing a Communications Link
As noted above, the Court construed the term “communication means for selectively establishing a communication link with each mobile phone unit” as it did previously in the Telemac v. Topp litigation.
In explaining the “automatic communications” through which the host processor can initiate a communication link, the Court “acknowledged that the customer dialing the system provider is one of the means through which a communication between the host processor and the customer can be initiated.” Telemac v. Topp, February 5, 1999 Order at 6, 10. However, the Court stated, even in that embodiment, the host provider activates and programs the phone by sending DTMF signals over an electronic link. See id. at 10 n.3; see also Telemac v. Topp, July 1, 1999 Order on Cross Motions for Summary Judgment on patent invalidity and patent infringement at 25 (“Even .when the user initiates communication with the host processor by calling the 800 number, the actual communication link is initiated by the host processor and involves an electronic transmission of data.”). In construing the claims, the Court found that the communication link established by the communication means must be an electronic link which transfers data over-the-air from the host processor directly to the phone unit. The ’100 patent requires that the programming and activation of the claimed device be accomplished automatically, not by the user manually punching in codes. Thus, in order for the USI’s telephone system to read on the communication means limitation, the host processor must be able to initiate the activation and programming of USI-enabled handsets.
USI argues that USI-enabled handsets do not include the “communication means for selectively establishing a communications link” limitation because the activation and programming of USI-enabled handsets requires the manual entry of the NAM parameters into the phone. USI claims that its host processor does not play a role in the programming of NAM parameters.
Telemac points out that, although USI’s experts now repudiate such representations, USI’s own promotional literature indicates that its telephone system includes over-the-air programming of NAM parameters. Therefore, Telemac asserts that USI’s debit telephone system literally meets the Court’s communication means definition because after the user of a USI-enabled handset presses the MEM 8 button the host processor can send back a DTMF message that includes the user profile.
Although USI’s experts dispute the statements in its literature, USI’s promotional statements demonstrate that there is a genuine issue of disputed fact as to whether USI-enabled handsets have the “communication means for selectively establishing a communication link.”
Telemac also argues that, even if USI does not literally infringe this element, USI’s telephone system includes this claim limitation under the doctrine of equivalents. However, the parties did not brief this claim in light of the Federal Circuit’s recent ruling on the doctrine of equivalents in Festo, 234 F.3d 558. Accordingly, the Court is not in a position to rule on this point.
C. Complex Billing Agorithm
As noted above, the Court has construed the ’100 patent’s complex billing algorithm element. The Court found that the complex billing algorithm element includes the *1083 means both to identify the appropriate rate category — local, long distance, roaming or international — and selectively to apply the rate to a particular phone call. See Telemac v. Topp, February 5, 1999 Order at 15-17.
USI argues that calls to Canada and the Caribbean, which USI-enabled handsets can make, are not international calls as defined by the ’100 patent. It contends that its telephone system does not read on the complex billing algorithm claim limitation because, unless the system provider has programmed the handset with a wild-card template, its handsets prohibit the user from making international calls other than to Canada and the Caribbean. Furthermore, USI claims that unless the wild-card template is programmed into its handsets, they do not store a separate international rate in memory.
The Court finds that USI-enabled handsets include the complex billing algorithm. First, Telemac is correct that calls to Canada and the Caribbean, which can be made on USI-enabled handsets, are international calls as defined by the TOO patent. The TOO patent states,
International Access Code — this is the required prefix that must be dialed to place a directly dialed international call. From the USA a customer would dial Oil + country code — city/area code + local digits in order to place an international call. This varies greatly from country to country. A length of 7 in the description above provides the system provider with the capability of serving places like the Caribbean. They require a standard 7 digit number as a prefix to [sic]. (This is just an example of place in the Caribbean.)
Bristow Infringement Decl., Ex. 2 at 15:51-60. Furthermore, USI-enabled handsets can be programmed to place other international calls and charge a separate rate for them. The fact that USI-enabled handsets must use a wildcard template to make an international call does not negate infringement. USI’s Dealer Manual instructs service providers how to program their handsets with wildcard templates to allow calls to countries other than Canada and the Caribbean, and to apply a separate rate for such calls.
USI-enabled handsets incorporate the claimed complex billing algorithm, both because they can make and charge for calls to Canada and the Caribbean, which are international calls, and because they can be programmed to make and charge for international calls to other countries.
D. Internal Means for Generating a Debit Account With an Account Amount in the Phone Unit
In construing this claim, the Court concluded that the system must assess charges and decrement the account amount in monetary units. See Telemac v. USI, September 6, 2000 Order at 18 (citing Telemac v. Topp, February 5, 1999 Order at 14).
USI argues that USI-enabled handsets do not include an internal means for generating a debit account with an account amount in the phone unit because its billing algorithm assesses charges and decrements the account amount in arbitrarily assigned accounting units having no unit label, such as dollars, or some other monetary unit. USI does concede that some USI-enabled handsets have the option of displaying the units remaining in the account with a dollar label. See O’Neal Deck, ¶ 6. However, USI claims that the dollar label is meaningless because the accounting units can be valued at any denomination and, therefore, unless the end user paid exactly one dollar for each unit, the dollar label is not a true representation of the account amount.
*1084 Irrespective of the dollar label, Telemac is correct that it is clear that the unit denominations in USI-enabled handsets are monetary units, as Mr. O’Neal admits when he testifies that USI-enabled handsets deduct the applicable rate once per minute. Accordingly, USI-enabled handsets include the claimed internal means for generating a debit account with an account amount in the phone unit.
E. Clock Chip
In construing the clock chip element, the Court found, based on the technical definition of the words and the description of the clock chip’s function in the specification, that clock chip is a term of art, describing a subsystem “separate and apart” from the processor that provides a timer for calls. See Telemac v. USI, September 6, 2000 Order at 15-17 (citing Telemac v. Topp, February 5, 1999 Order at 13).
Telemac argues that USI-enabled handsets include a clock chip. Its experts dismantled USI-enabled handsets and found Kyocera clock chips. Telemac’s expert states that these clock chips provide the timing signal for USI’s software and act as timers for calls.
Without citing any evidence, USI argues that the Kyocera chip is merely an oscillator and that it does not act as a timer for calls. Rather, USI claims that a USI-enabled handset times calls using a software routine, which it claims does not execute separate timer hardware or obtain data from hardware separate and apart from the processor. The factual basis USI cites for this claim is not persuasive. USI’s attempt to distinguish the Kyocera chip from a clock chip is unavailing because, as USI admits in its surreply, the Kyocera chip in a USI-enabled handset provides the timing reference for calls. Therefore, USI-enabled handsets include the claimed clock chip described in the ’100 patent.
CONCLUSION
For the foregoing reasons, the Court DENIES USI’s motion for summary judgment that the TOO patent is invalid as anticipated by the Loder patent and GRANTS USI’s motion for summary judgment that claims two and five of the TOO patent are anticipated by the Wittstein patent. Telemac’s cross-motion for partial summary judgment that the Loder patent does not anticipate any of the TOO patent’s claims is GRANTED.
However, there is a genuine issue of disputed fact as to whether the USI-enabled handsets include the communication means for selectively establishing a communication link. USI-enabled handsets must include every element of claim one in order to infringe claims seven, ten, twenty-five, twenty-six, and twenty-seven because these claims depend on claim one. Therefore, the Court DENIES both Telemac’s motion for summary judgment of infringement and USI’s cross-motion for summary judgment of non-infringement.

. See Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed.Cir.1995), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

. In the Telemac v. Topp litigation, the Court also concluded that dependent claim twenty-two of the '100 patent is invalid as anticipated by the Wittstein patent.