**SWIMWAYS CORP. Plaintiff,**

v.

**OVERBREAK, LLC, Defendant.**

**No. 1:04CV627.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 21, 2005.

Stephen Edward Noona, Kaufman & Canoles PC, Norfolk, VA, for Plaintiff.

Paul Frederick Brinkman, Marianne Roach Casserly, Alston & Bird LLP, Washington, DC, for Defendant.

## *MEMORANDUM OPINION*

ELLIS, District Judge.

At issue at the *Markman*[1]/summary judgment stage of this patent infringement action are (i) the construction of two claim terms, and (ii) the question whether there is literal or doctrine-of-equivalents infringement once the terms have been

---

1. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (holding that the proper construction of disputed claim terms is a question of law for the court).

properly construed. For the reasons that follow, the construction of one of the disputed terms requires the conclusion that there is no literal or doctrine-of-equivalents infringement. Given this, it is unnecessary to reach defendant's argument that plaintiff's construction of the disputed terms renders the patent at issue invalid.

## I.

The United States Patent and Trademark Office issued U.S. Patent No. 6,485,-344 B2 ("the '344 patent"), entitled "Collapsible Flotation Device," to inventor David Arias on November 26, 2002. The patent claims an invention in the field of personal flotation devices, and thus includes in its description of related art such items as "floats, rafts, lifeboats, [and] life preservers," as well as "items which are collapsible through the use of a collapsible metal or plastic spring," such as "children's play structures" and "tent-like shade structures." '344 patent, col. 1, ll. 15–30. When configured in accordance with Figure 5 of the '344 patent, the invention described by the patent consists of a flexible, oval-shaped mesh panel surrounded by an inflatable bladder that is itself surrounded by a coilable spring. *See* Exhibit 1.

Defendant Overbreak, LLC, a Nevada entity, manufactures and distributes the HoverDisc balloon toy. The HoverDisc consists of an inflatable circular bladder, approximately three feet in diameter, surrounded by a closed-loop collapsible spring. Between the bladder and the spring is a heat-fused seam, approximately .3 inches wide. The bladder fills the entire area within the seam but does not actually touch the spring. The Hover Disc is in-

tended to be filled with air or helium and then tossed in the air as a toy.

In May 2004, plaintiff Swimways Corp., a Virginia corporation, acquired the rights to the '344 patent and immediately thereafter commenced this action against defendant, contending that the HoverDisc infringes the '344 patent. Plaintiff has since narrowed the focus of its infringement complaint to claim 23 of the '344 patent, which claims the following invention:

> A **device**, comprising:
> a spring configured to form a closed loop, the spring being moveable between a coiled configuration when the spring is collapsed and an uncoiled configuration when the spring is expanded, the spring defining an interior area within at least a portion of the closed loop when the spring is in the uncoiled configuration; and
> an inflatable bladder coupled to said spring and being **disposed circumferentially** within said interior area.

In November 2004, defendant moved for summary judgment on the issue of infringement,[2] contending that the elements of claim 23 do not read on the HoverDisc because (i) the term "device," construed in light of the '344 patent specification, refers exclusively to collapsible flotation devices, which the HoverDisc is not; and (ii) the phrase "disposed circumferentially" does not read on the HoverDisc's bladder because the HoverDisc's bladder does not encircle and define an interior area. Plaintiff, in turn, cross-moved for summary judgment on the infringement issue, contending that the HoverDisc falls squarely within the terms of claim 23 because (i) the '344 patent specification does

---

**2.** Defendant also moved for summary judgment on the issue of the validity of the '344 patent, and plaintiff subsequently cross-moved for summary judgment on the same issue. As stated at the outset, however, be-

cause it is apparent that the HoverDisc does not infringe the '344 patent, it is unnecessary to determine whether the '344 patent is invalid, and accordingly, the issue is not addressed here.

not limit the plain meaning of the term "device," which encompasses "almost anything," including the HoverDisc; and (ii) the phrase "disposed circumferentially" reads on any object that occupies the perimeter of a defined area, even if it also occupies the center of that area, as the HoverDisc's bladder does. These motions, having been fully briefed and argued, are now ripe for disposition.

## II.

■ Patent infringement analysis involves a two-step process: first, the scope of the claims are determined as a matter of law pursuant to *Markman*, and second, the properly construed claims are compared to the allegedly infringing device to determine, as a matter of fact, whether all of the limitations of at least one claim are present, either literally or by substantial equivalent, in the accused device. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed.Cir.2002); *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed.Cir.1999). Summary judgment is appropriate when no genuine issue of material fact exists with respect to the latter determination, *i.e.*, whether at least one claim, correctly interpreted, reads on the alleged infringing device. *See Lifescan, Inc. v. Home Diagnostics, Inc.*, 76 F.3d 358, 359 (Fed.Cir.1996). Accordingly, the first step toward resolution of the parties' cross-motions for summary judgment is the construction of the two disputed terms of claim 23.

## III.

■ *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), was a watershed event in patent litigation, establishing once and for all that the construction of patent claims is a matter of law exclusively for the court. *See also Teleflex*, 299 F.3d at 1323. Under *Markman* and its progeny, the principal guide to the interpretation of disputed claim language is the evidence intrinsic to the patent itself, specifically the patent's claims, specification, and prosecution history or "file wrapper." *See Hockerson–Halberstadt, Inc. v. Avia Int'l, Inc.*, 222 F.3d 951, 955 (Fed.Cir.2000); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed.Cir.1996). Only in the relatively rare instance where the intrinsic evidence is insufficient to resolve ambiguous claim language may a court look to evidence extrinsic to the patent, *e.g.*, expert testimony, as an interpretive aid.[3] *See Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed.Cir.2003); *Vitronics*, 90 F.3d at 1583. And in no instance should claims be construed in light of the allegedly infringing device; it is only after the patent claims have been properly construed that they are applied to the accused device to determine whether infringement exists. *SRI Int'l v. Matsushita Electric Corp. of America*, 775 F.2d 1107, 1118 (Fed.Cir.1985).

■ Because "it is the claims that define the claimed invention," *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571 (Fed.Cir.1988), analysis of the intrinsic evidence focuses first on the words of the patent claims themselves. *See Tex. Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1201–02 (Fed.Cir.2002); *Hockerson–Halberstadt*, 222 F.3d at 955; *Vitronics*, 90 F.3d at 1582. While it is well-settled that a patentee may act as his own lexicographer and give claim terms a

---

3. Of course, it is always appropriate for a district court to consult expert testimony or other extrinsic evidence as needed as an aid to understanding the art or technology involved. *See Vitronics*, 90 F.3d at 1585 ("Had the district court relied on the expert testimony and other extrinsic evidence solely to help it understand the underlying technology, we could not say the district court was in error.").

meaning of his own choosing, claim terms "bear a heavy presumption that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *Tex. Digital,* 308 F.3d at 1202 (internal quotation marks omitted); *Vitronics,* 90 F.3d at 1582 ("words in a claim are generally given their ordinary and customary meaning"). Accordingly, a claim term should be interpreted to have a meaning that is consistent with its customary meaning, and should be given "the full range" of that meaning, unless the patent specification "set[s] forth an explicit definition of the term different from its ordinary meaning," or uses words that represent "a clear disavowal of claim scope." *Tex. Digital,* 308 F.3d at 1202, 1204. In the absence of the inventor's express lexicography or patent language disavowing claim scope, courts are free to consult common-language dictionaries as aids in determining the ordinary and customary meaning of claim terms. *See id.; Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1459 (Fed.Cir. 1998).[4]

■ An important corollary to the rule that the words of the claims determine the scope of the patent is the princi-ple of claim differentiation, which presumes that there is "a difference in meaning and scope when different words or phrases are used in separate claims." *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed.Cir.1998) (quoting *Tandon Corp. v. United States Int'l Trade Comm'n,* 831 F.2d 1017, 1023 (Fed.Cir.1987)). Thus, if the absence of a difference in meaning or scope would make certain claims redundant or super-fluous, it is presumed that differing language between the claims is significant. *See Comark,* 156 F.3d at 1187. By the same token, when the same terms or phrases are used in separate claims, those terms or phrases must be interpreted consistently throughout the patent. *See Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1579 (Fed.Cir.1995).

■ Additionally, not all parts of a claim are given equal weight in the determination of claim meaning. In particular, the preamble[5] to a claim is generally not construed as a limitation on claim scope. *See Allen Eng'g Corp. v. Bartell Indus.,* 299 F.3d 1336, 1346 (Fed.Cir.2002). It is well-settled, however, that a preamble will be construed as a limitation when it "re-

---

4. There currently exists some lack of clarity in the law as to the proper role of dictionaries in the claim-construction analysis. *Compare Tex. Digital,* 308 F.3d at 1204 ("Consulting the written description and prosecution history before any effort is made to discern the ordinary and customary meanings ... invites a violation of our precedent counseling against importing limitations into the claims."), *with C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed.Cir.2004) ("*Texas Digital Systems* cannot be read as holding that a dictionary definition trumps the intrinsic record."); *see also Phillips v. AWH Corp.,* 376 F.3d 1382 (Fed.Cir.2004) (ordering *en banc* review of the issue). This situation, as will become apparent, is no impediment to the resolution of this case. Yet, it is worth noting that if a central tenet of claim construction is that claim terms must be given their ordinary and customary meaning, then it inexorably follows that common usage dictionaries must play an important role in the parsing of the intrinsic record. Technical or scientific dictionaries and encyclopedias stand on a different footing; because they are essentially a form of expert opinion, technical or scientific dictionaries and encyclopedias are extrinsic evidence. *But cf. Vitronics,* 90 F.3d at 1584 n. 6 ("Technical treatises and dictionaries ... are worthy of special note. Judges are free to consult such resources at any time ....").

5. A claim typically contains three parts: (i) the preamble, *e.g.,* "a device"; (ii) the transitional word or phrase, *e.g.,* "comprising"; and (iii) the main body of the claim. *See, e.g., Bristol–Myers Squibb Co. v. Immunex Corp.,* 86 F.Supp.2d 447, 450 (D.N.J.2000).

cites essential structure or steps, or ... is 'necessary to give life, meaning, and vitality' to the claim," or was essential during prosecution to distinguish the claimed invention from prior art. *Brassica Protection Products LLC v. Sunrise Farms (In re Cruciferous Sprout Litig.)*, 301 F.3d 1343, 1347 (Fed.Cir.2002).

 Analysis of the intrinsic evidence should focus next on the patent's specification, including the drawings and figures depicting the preferred embodiments of the invention. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed.Cir.2001). The patent specification is "highly relevant to the claim construction analysis" and offers "the single best guide to the meaning of a disputed [claim] term." *Vitronics*, 90 F.3d at 1582. Patent claims are thus construed in light of the specification, and the claims and specification are both read with a view to ascertaining the invention. *See Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed.Cir.1998). Because the goal is merely to construe the claims, however, and not to rewrite them, a district court must guard against improperly importing limitations from the specification into the claims when no such limitations appear in the claims themselves. *See Tex. Digital*, 308 F.3d at 1204–05. While "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification," *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed.Cir.2004) (quoting *Comark*, 156 F.3d at 1186–87), the proper balance in this regard "turns on how the specification characterizes the claimed invention," *i.e.*, whether the specification describes "the very character of the invention," or merely certain preferred embodiments, as possessing a particular limitation. *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed.Cir.2003).

 Federal Circuit precedent teaches that district courts may also refer to the patent's prosecution history in interpreting disputed claim terms. *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 866 (Fed.Cir.2004); *Vitronics*, 90 F.3d at 1582. Amendments to patent applications that narrow the scope of claim language, for instance, frequently inform what the amended claims do not cover. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733–35, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002) (explaining prosecution history estoppel). District courts have broad power to look at the prosecution history to determine "the true meaning of language used in the patent claims," since this history may demonstrate the patentee's understanding and use of the relevant terms at the time of the application. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Among other things, consideration of a patent's prosecution history may prevent a patentee from construing a claim term one way during prosecution to obtain the patent and then in a different way during litigation to strengthen his argument for infringement. *See Southwall*, 54 F.3d at 1576. As with the patent specification, however, the prosecution history may only be used to inform the analysis of claim language, not to "enlarge, diminish, or vary the limitations in the claims." *Markman*, 52 F.3d at 980.

 Ultimately, the construction of a disputed claim term must be based on what the inventor intended to include within the particular claim at issue. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed.Cir.1998). With this goal in mind, "the construction that stays true to the claim language and most naturally aligns with the patent's descrip-

tion of the invention will be, in the end, the correct construction." *Id.* These principles must be brought to bear on the two disputed elements of claim 23 of the '344 patent, each of which is considered separately.

## A. Device

■ The first disputed term—"device"—appears in the preamble of claim 23. Defendant contends that in the context of the '344 patent, the term refers exclusively to collapsible flotation devices, and that claim 23 therefore does not describe objects like the HoverDisc that are not intended for flotation. Plaintiff, conversely, contends that the term "device" can be used to describe "almost anything," and thus that it does not limit the scope of claim 23. As an initial matter, neither party contends that the patentee of the '344 patent acted as his own lexicographer with respect to the term "device," or that the term has a specialized, technical meaning in the relevant fields of industrial art. Accordingly, the starting point in the claim construction inquiry is the ordinary and customary meaning of the term "device." *Tex. Digital,* 308 F.3d at 1201–02.

The dictionary definition of "device" is a "thing adapted for a purpose or designed for a particular function," or "something devised or contrived." THE CONCISE OXFORD DICTIONARY 262 (7th ed.1983); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 317 (10th ed.1999).[6] The term "device," therefore, encompasses items and instruments of any function and purpose, not merely, as defendant claims, the specific purpose of aquatic flotation.

The principle of claim differentiation confirms that the term "device" should be construed in accordance with this ordinary and customary meaning. While claim 23 uses only the naked term "device" as a preamble, claim 2 of the '344 patent begins with the preamble "a collapsible floatation device," and claims 1, 9, and 18 begin with the preamble "a collapsible device." '344 patent, col. 4, 1. 27 (claim 2); col. 4, 1. 15 (claim 1); col. 4, 1. 59 (claim 9); col. 5, 1. 26 (claim 18). Thus, construing the term "device" to include the qualities of flotation and collapsibility would render portions of these other claims superfluous, and for that reason a broader construction of "device" is required. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1326 (Fed.Cir.2003) ("[W]hen a patent claim 'does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.'" (quoting *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1122 (Fed.Cir. 1985))).

The fact that the term "device" appears only in the preamble of claim 23 points to the same conclusion. As previously stated, a claim preamble is generally not construed as a limitation on claim scope. *See Allen,* 299 F.3d at 1346. Here, nothing about the phrase "a device" serves to "recite[ ] essential structure or steps" or "give life, meaning, and vitality" to claim 23 in a manner that would permit a limiting construction. *See In re Cruciferous Sprout Litig.,* 301 F.3d at 1347. A cursory comparison of the preamble of claim 23 with preambles held to limit claim scope will illustrate this point. In *In re Cruciferous Sprout Litigation,* for example, the Federal Circuit held that the preamble "a method of preparing a food product rich in glucosinolates" limited the scope of the claim at issue because it had helped distinguish the claimed invention from other food-preparation methods during prosecution. *Id.* Similarly, in *Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298,

---

**6.** Consistent with this common meaning, defendant's expert witness conceded in deposition that a "device" "could just be almost anything." Pl.'s Mem. in Opp. at 8.

1306 (Fed.Cir.1999), the preamble "a method of producing on a photoreceptor an image of generated shapes made up of spots" was held to be "intimately meshed with the ensuing language in the [body of the] claim," such that it was necessary to construe the preamble and the body as "one unified and internally consistent recitation of the claimed invention." By contrast, the mere phrase "a device" provides no insight at all into the nature or purpose of the invention at issue here, and thus cannot serve to limit the scope of claim 23.

Seeking to avoid this result, defendant, invoking the principle that claims "must be read in view of the specification," *Markman,* 52 F.3d at 979, contends that the '344 patent specification contains "a plethora of globally defining references regarding the term 'device,'" that establish that the scope of claim 23 is narrower than the ordinary and customary meaning of "device" implies. Def.'s Reply Mem. at 7–8. In particular, defendant cites the facts that:

(i) the "Field of the Invention" states, "In particular, the present invention relates to inflatable flotation devices which are collapsible through use of a spring mechanism";

(ii) the "Description of the Related Art" states, "Inflatable flotation devices are well known in the form of floats, rafts, lifeboats, life preservers and other like devices";

(iii) the "Summary of the Disclosure" states, "A collapsible flotation device is described which includes a coilable spring and a flexible panel"; and

(iv) the "Detailed Description of the Preferred Embodiments" states, "At the edges of the flotation device, the material is double thickness, forming a pocket around the perimeter of the flotation device."

Def.'s Reply Mem. at 8. These specification phrases, defendant argues, limit the meaning of the term "device" because they "define the invention overall," rather than merely specific embodiments of it. *Id.* In support of this argument, defendant cites *C.R. Bard,* 388 F.3d at 858, in which the Federal Circuit held that language appearing in the "Summary of the Invention" and "Abstract" sections of the patent specification, while not constituting express lexicography or a disavowal of claim scope, *id.* at 863 n. 3, nonetheless narrowed the meaning of the term "plug" to mean a plug with a pleated surface, *id.* at 866. The specific phrases at issue in *C.R. Bard* were:

(i) "the present invention is an implantable prosthesis.... the implant includes a pleated surface"; and

(ii) "implantable prosthesis including a conical mesh plug having a pleated surface ...."

*Id.* at 864. The Federal Circuit in *C.R. Bard* concluded that these phrases narrowed the meaning of "plug" based on the facts (i) that they appeared in sections of the specification that describe the invention as a whole, rather than merely preferred embodiments, *id.*; and (ii) that they "expressly define[d] the inventive plug as 'having' or 'including a pleated surface,'" *id.* at 865. The court went on to state that the prosecution history of the patent provided an independent ground for the same conclusion, holding that in the course of prosecution, the plaintiff "made a clear statement to the examiner that 'the surface of the inventive plug is pleated,'" in order to distinguish the invention from prior art. *Id.* at 869.

Here, defendant's reliance on *C.R. Bard* is misplaced for at least three reasons. First, of the statements in the '344 specification that defendant cites, only one, "A collapsible flotation device is described which includes a coilable spring and a flex-

ible panel," comes from a specification section directed to the invention as a whole, *i.e.,* "Summary of the Disclosure";[7] the others appear in sections directed to related art or specific embodiments and thus are unlikely to have been intended as "global" and limiting definitions. *See C.R. Bard,* 388 F.3d at 864. Second, the term "device" in the '344 patent is not analogous to the term "plug" in the patent at issue in *C.R. Bard;* "device" appears in only the preamble of claim 23, and serves merely to identify the claimed invention as a tangible object rather than a process or method; "plug," by contrast, appeared in the body of the claim at issue in *C.R. Bard* and described the very substance of the claimed invention in that case. Third, despite defendant's conclusory allegation to the contrary, nothing in the record suggests that the term "device" had to be construed as "collapsible flotation device" during prosecution to distinguish the '344 patent from prior art.[8] Unfortunately for defendant, *C.R. Bard* does not stand for the principle that the use of term in the claim preamble that defines a broad universe of objects and essentially serves only to identify the claim as a product rather than a process claim, must somehow be construed to apply to a small subset of that broad universe. Instead, the holding in *C.R. Bard* is a narrow one, arguably resting as much on the patent's prosecution history as on the specification. *See id.* at 870 (Prost, J., concurring) ("Because the inventors clearly disclaimed coverage of non-pleated plugs in the reexamination . . . we may [resolve the dispute] on that basis alone; accordingly, I find it unnecessary to reach the remaining grounds for affirmance relied upon by the majority."). In sum, to accept defendant's argument regarding the proper construction of "de-

vice" would be to engage in the impermissible exercise of reading a limitation from the patent specification into the claims. *See Tex. Digital,* 308 F.3d at 1204–05. For that reason, defendant's argument that the term "device" should be construed to mean "collapsible flotation device" must fail.

For the foregoing reasons, the term "device," as used in the preamble of claim 23, does not limit the scope of claim 23.

## B. Disposed Circumferentially

■ The second disputed term—"**disposed circumferentially**"—appears in the body of claim 23 and describes the placement of the inflatable bladder component of the invention. Defendant contends that "disposed circumferentially" describes a bladder placed along the perimeter of an object or space such that it encircles and defines an interior area. Plaintiff, however, argues that the phrase reads on any bladder occupying the perimeter of a defined area, even if it also occupies the interior of that area. Plaintiff claims, in other words, that a bladder "disposed circumferentially" can fill, rather than simply surround, an interior space, provided that "its edge extends along the circumference or perimeter area within the interior area." Pl.'s Mem. of Opp. at 11. As with the term "device," neither party contends that the inventor acted as his own lexicographer with respect to the phrase "disposed circumferentially," or that the phrase has a specialized, technical meaning in the relevant fields of industrial art. Accordingly, analysis of the intrinsic evidence must begin with the ordinary and customary meaning of the plain language of claim 23. *Tex. Digital,* 308 F.3d at 1201–02.

---

7. '344 patent, col. 1, ll. 52–53.

8. Indeed, neither party has adduced evidence suggesting that the term "device" was rele-

vant in any way in the prosecution of the '344 patent.

Conveniently and appropriately, the parties are largely in agreement with respect to the plain meaning of the language at issue. First, the parties agree that the word "circumferentially" refers to the perimeter of a generally circular object or area. Second, the parties also agree that the phrase "disposed circumferentially" describes the placement of the bladder in the overall invention, not the shape of the bladder. By mutual agreement, therefore, the phrase "an inflatable bladder coupled to [a] spring and ... *disposed circumferentially* within [an] interior area" describes a bladder placed along the perimeter of an interior area defined by a surrounding spring. This agreed ordinary and customary meaning, however, does not answer the question whether a bladder thus described necessarily encircles a second interior space, *i.e.*, is annular in shape.

Comparing the language of claim 23 to that of other claims in the '344 patent, however, provides some support for a construction of "disposed circumferentially" that requires encirclement. Claim 24, for example, describes "[t]he device of claim 23, **said inflatable bladder defining a second interior area**, further comprising a panel coupled within said second interior area." The phrase beginning, "said inflatable bladder," serves to clarify that the referenced bladder—claim 23's bladder—encircles a second interior area. Contrary to plaintiff's contention that the phrase actually highlights a difference between claims 23 and 24, the difference between the claims is plainly set forth through the use of the phrase "further comprising," which goes on to differentiate claim 24 from claim 23 by requiring that a panel be placed in the interior area defined by the

bladder. Thus, the plain language of claim 24 supports the argument that "disposed circumferentially" should construed to require encirclement of an interior area.

Opposing this conclusion, plaintiff offers a different comparison of claim terms from the '344 patent. As plaintiff points out, claim 2 describes an inflatable bladder "disposed circumferentially *about*" an interior panel. Seizing on claim 2's substitution of the word "about" for "within," plaintiff contends that claim 2 necessarily describes an encircling bladder, and, conversely, that the bladder of claim 23 should not be construed necessarily to encircle. The weakness in this argument is that while it clearly distinguishes the meanings of the terms "about" and "within," it offers no instruction as to the inherent contextual meaning of "disposed circumferentially." Thus, while the principle of claim differentiation makes clear that the bladder described in claim 2 is located *outside* an interior panel, and that the bladder described in claim 23 in located *inside* an exterior spring, it does not establish whether claim 23's bladder must encircle an interior area or may converge to the center of the interior space.

The '344 patent specification provides further guidance on the question whether, in context, a bladder "disposed circumferentially" necessarily encircles an interior area. The "Summary of the Disclosure" section, which describes the invention as a whole rather than merely the preferred embodiments,[9] states that the invention "includes a coilable spring and a flexible panel," and that "[a]long the outer edge of the flexible panel is a perimeter pocket into which the coilable spring and at least one inflatable chamber are placed."[10]

---

**9.** *See C.R. Bard,* 388 F.3d at 864 (stating that sections describing the invention as a whole are more likely to support "a limiting definition of a claim term").

**10.** '344 patent, col. 1, ll. 52–56.

This description is consistent with a reading of "disposed circumferentially" that requires encirclement. The fact that the Summary goes on to state that "[i]n addition to or instead of the perimeter pockets, the central portion of the flexible panel may include pockets into which inflatable chambers may be placed," does not alter this conclusion, as it highlights the contrast between "central" and "perimeter," i.e., circumferential, placement.[11]

The prosecution history of the '344 patent also supports a construction of "disposed circumferentially" that requires encirclement. Among other things, it reflects that the phrase "disposed circumferentially" was added after the predecessor of claim 23 was rejected by the patent examiner in January 2002 as anticipated by U.S. Patent No. 6,171,100 ("the '100 patent"), which described a device composed of a closed-loop spring surrounding a circular bladder. See Exhibit 2. The written summary of the rejection states that the inventor and examiner discussed "circumferential disposal of the spring and/or bladder" as potential claim language to distinguish claim 23 from the '100 patent. Because the prior art sought to be avoided by the use of a bladder "disposed circumferentially" included a circular, centrally-located bladder, the phrase "disposed circumferentially" cannot be reasonably be construed to read on a bladder occupying the center of an interior area. While plaintiff correctly notes that the drawings in the '100 patent do not depict the bladder extending all the way

to the perimeter defined by the spring—and thus do not depict a bladder "disposed circumferentially" under its proposed construction of that phrase—it is difficult to discern a patentable distinction between a circular, centrally-located bladder that occupies the entire area defined by a closed loop spring and a circular, centrally-located bladder that occupies less than all of that area. Accordingly, construing "disposed circumferentially" to require encirclement rather than mere occupation of a perimeter creates a clearer distinction between the '344 patent and the '100 patent. Additionally, the prosecution history reflects that the examiner described several pieces of prior art as having a bladder "disposed circumferentially," and that in each case the bladder so described encircled rather than filled an interior space. As with the specification, therefore, the prosecution history of the '344 patent makes clear that as used in claim 23, the phrase "disposed circumferentially" describes an encircling object.

For the foregoing reasons, the phrase "disposed circumferentially" does not describe an object that entirely fills the interior of a defined area even if it also occupies the perimeter portion.

## IV.

 After disputed claim terms have been properly construed as a matter of law, summary judgment should be entered when no genuine issue of material fact exists with respect to application of the

---

**11.** '344 patent, col. 2, ll. 3–6. Additionally, although not part of the claim construction analysis, it is nonetheless worth noting that the specification drawings and descriptions all depict bladders that encircle a flexible panel on which a person might lie. In the one suggested alternative configuration that includes bladders in the central portion of the

flexible panel, the central bladders merely cross the panel rather than fill the central space and thus are not "disposed circumferentially" under either party's definition. See '344 patent, fig. 4. Accordingly, the specification draws a clear distinction between centrally-located bladders and bladders "disposed circumferentially."

patent claims to the alleged infringing device. *See Lifescan,* 76 F.3d at 359; FED. R. CIV. P. 56(c). As stated at the outset, infringement exists when all the limitations of at least one claim are present, either literally or by substantial equivalent, in an accused device. *See Teleflex,* 299 F.3d at 1324; *Johnson,* 175 F.3d at 988. When attempting to determine whether a limitation is present by "substantial equivalent," courts generally inquire whether the accused device performs the substantially same function, in substantially the same way, to achieve the same result as the claimed invention. *See Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 40–41, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

## A. Literal Infringement

■ The question of literal infringement, like that of claim construction, begins with the language of the patent claims at issue. As previously noted, claim 23 of the '344 patent describes a closed-loop spring encircling a bladder that itself encircles and defines a second interior area. So construed, claim 23 does not describe the HoverDisc. There is no genuine issue of material fact regarding the HoverDisc's physical properties: it consists of a closed-loop spring surrounding a bladder that fills the entirety of the space inside the spring. The HoverDisc's bladder does not encircle and define a second interior area and thus is not "disposed circumferentially" as claim 23 requires. Summary judgment for the defendant on the question of literal infringement is therefore appropriate.

## B. Infringement Under the Doctrine of Equivalents

The doctrine of equivalents reflects judicial recognition of the reality that "language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty," and that the value of innovation would be greatly diminished if one's rights in an invention could be defeated by the use of "[u]nimportant and insubstantial substitutes" for certain of that invention's elements. *Festo,* 535 U.S. at 731, 122 S.Ct. 1831. Accordingly, the doctrine of equivalents permits an action for patent infringement in circumstances where the literal terms of patent claims do not read on the accused device. *Id.* at 732, 122 S.Ct. 1831 ("The scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described."). As previously stated, a test for infringement under the doctrine of equivalents is whether the accused device performs substantially the same function, in substantially the same way, to achieve the same result as the claimed invention. *See Warner–Jenkinson,* 520 U.S. at 40–41, 117 S.Ct. 1040.

■ Here, it is apparent that the HoverDisc does not at all perform the same function in substantially the same way to achieve the same result as the claimed invention. To the contrary, the HoverDisc functions in a markedly different way from the claimed invention to achieve a completely different result. The '344 patent specification states that the object of the invention is "to provide a collapsible flotation device" that uses circumferential bladders to support the body weight of a human being in water. Far removed from this is the HoverDisc, which is intended to be thrown through the air as toy. While there is little doubt that the HoverDisc would float if placed in water, the record is devoid of evidence that it can be used for flotation in the same manner as the '344 patent's "Collapsible Flotation Device." Therefore, because there is no genuine issue of material fact regarding the func-

tion of the HoverDisc or the result achieved by its use, defendant is entitled to summary judgment on the issue of infringement by substantial equivalence.

**V.**

For the foregoing reasons, plaintiff's motion for summary judgment is **DENIED**, and defendant's motion for summary judgment is **GRANTED**.

An appropriate order has issued.

EXHIBIT 1

**U.S. Patent** Nov. 26, 2002 Sheet 3 of 5 **US 6,485,344 B2**

# FIG. 5

# FIG. 6

651

FIG. 15